# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                          **Jointly Administered under**
                                                     **Case No. 08-45257**

Petters Company, Inc., et al.                   Court File No. 08-45257

          Debtors.
                                                Court Files Nos.:
  (includes:
  Petters Group Worldwide, LLC;                 08-45258 (GFK)
  PC Funding, LLC;                              08-45326 (GFK)
  Thousand Lakes, LLC;                          08-45327 (GFK)
  SPF Funding, LLC;                             08-45328 (GFK)
  PL Ltd., Inc.;                                08-45329 (GFK)
  Edge One LLC;                                 08-45330 (GFK)
  MGC Finance, Inc.;                            08-45331 (GFK)
  PAC Funding, LLC;                             08-45371 (GFK)
  Palm Beach Finance Holdings, Inc.),           08-45392 (GFK)

                                                Chapter 11 Cases
                                                Judge Gregory F. Kishel

Douglas A. Kelley, in his capacity as the
court-appointed Chapter 11 Trustee of
Debtor Petters Company, Inc. and Debtor Petters Group
Worldwide LLC,

          Plaintiffs,

vs.                                             Adv. No. 10-04256

Alan M. Miller and A.M. Aero, Inc.

          Defendants.

## DEFENDANTS ALAN M. MILLER'S AND A.M. AERO, INC.'S
## REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

**ARGUMENT**

Rather than duplicate memoranda in support of other parties' motions, Alan Miller and

A.M. Aero, Inc. ("Alan Miller") joins arguments that are expected to be set forth in the following

parties' reply memoranda in support of their pending motions to dismiss:

1)       WestLB AG, New York Branch (Adv. No. 10-04301) ("WestLB");

2)       Kenneth Johnson (Adv. No. 10-04423) ("K. Johnson");

3)       Kenneth Colvin, et al. (Adv. No. 10-04266) ("K. Colvin").

Alan Miller joins the above parties' reply memoranda with respect to the following

points:

A)       That the Trustee's claims are barred by the statute of limitations (K. Johnson; K.

Colvin);

B)       That the Trustee has not sufficiently identified a "golden creditor" and therefore

lacks standing (K. Johnson; K. Colvin);

C)       That the complaint does not meet the pleading requirements of Fed. R. Civ. P. 9

(b) (WestLB; K. Johnson; K. Colvin);

D)       That the complaint fails to plead actual intent to hinder, delay, or defraud

(WestLB; K. Colvin);

E)       That the complaint fails to sufficiently plead that the Miller transfers were in

furtherance of a Ponzi scheme (WestLB);

F)       That the complaint fails to sufficiently plead that the transfers were not for

reasonably equivalent value, or payments on antecedent debts (WestLB; K.

Colvin);

G)       That the complaint fails to rebut a good faith defense (K. Colvin);

H)      That the complaint fails to rebut a "for value" defense (K. Johnson; K. Colvin);

I)      That the complaint fails to state a claim for turnover and accounting (K. Johnson; K. Colvin);

J)      That the complaint fails to state a claim for unjust enrichment (WestLB; K. Johnson; K. Colvin);

K)      And that the complaint fails to state claims to avoid, disallow, or subordinate claims and avoid liens.  (WestLB; K. Johnson; K. Colvin).

Miller writes separately to add his own substantive analysis with respect to whether the Trustee has rebutted his showing that the claims against him are time-barred, and whether the Trustee has adequately pleaded a rebuttal to Miller's good-faith defense.

## I.      The Trustee's claims are time-barred with respect to Alan Miller's transactions, which occurred on August 5, 2002 and October 25, 2002.

The Trustee's Complaint alleges transfers to Alan Miller on August 5 and October 25, 2002.  The Complaint was filed on September 23, 2010, long after the limitations period had run.

The Trustee claims that there is, essentially, *no limitation* on his claims, and that Alan Miller's single transaction with Petters may haunt Miller and subject him to financial penalty even eight years after their last dealing.  The Trustee somehow believes that subjecting defendants to such stale claims promotes public policy.  The Trustee is incorrect.

Alan Miller made a single, short-term loan at a reasonable interest rate.  The Complaint gives no indication that Miller was on notice of any of the supposed "indicias of fraud" that were allegedly noticeable by other repeated and/or later investors, yet the Trustee seeks to redistribute Miller's dollars to those very same investors, naturally after payment of substantial attorneys' fees.  *Cf. Bergstrom et al., v. Dalkon Shield Claimants Trust (In re:  A.H. Robins Co.)*, 86 F.3d 364, 367 (4th Cir. 1996) ("Four hundred years ago William Shakespeare observed that lawyers

3

'dream on fees'."). Public policy cannot possibly support such a reviving of stale claims; if Miller was alleged to have *stolen* $180,000 from PCI, he could not now be prosecuted for it. *See* Minn. Stat. § 609.52 Subd. 2(4) (2010) (defining crime of theft by swindling) *and* 628.26 (h) (2010) (stating complaint for theft by swindling must be filed "within five years of the commission of the offense"). The trustee's argument turns equity on its ear.

The Trustee's claims are clearly time-barred. Nothing in the bankruptcy code gives the Trustee authority to revive claims after the statutes of limitations have run.

### A. The discovery rule does not apply to the Trustee's claims.

Courts applying Minnesota law have consistently limited the discovery rule to claims based on common-law fraud in which the plaintiff *actually relied* on the defendant's conduct. *See, e.g.*, *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 926 (8th Cir. 2004) (Consumer fraud claims governed by six-year limitations period for statutory claims; no discovery rule); *Kopperud v. Agers*, 312 N.W.2d 443, 446-47 (Minn. 1981) (discovery rule inapplicable to securities-fraud claims). The Trustee claims that, though its rights to avoid allegedly fraudulent transfers are granted by statute, they are nonetheless common-law in character, and are therefore governed by Minnesota's limitations period for common-law fraud. (Omnibus Memo., 25-26).

The Trustee's position is not supported by the authority on which it relies. To be sure, some of the Minnesota cases that the Trustee cites have stated (without analysis) that fraudulent-conveyance actions are subject to a discovery rule, but none of them has ever considered the issue presented here, i.e., whether fraudulent-conveyance actions are governed by the six-year period for statutory causes of action under Minn. Stat. § 541.05, Subd. 1(2) (2010). The discovery rule does not apply to the Trustee's fraudulent-conveyance and unjust-enrichment

claims, and they are therefore untimely with respect to Alan Miller's August 5, 2002 and October 25, 2002 transactions.

### B. Alan Miller is not equitably estopped from asserting a statute-of-limitations defense by Petters' alleged fraudulent concealment.

Nor are the Trustee's claims saved by applying equitable estoppel to prevent Alan Miller from asserting the statute-of-limitations' bar. The authority on which the Trustee relies involves equitable *tolling*, not equitable *estoppel*. (*See generally*, Omnibus Memorandum, 32-40). The Trustee cites only three Minnesota cases for this proposition, and all of them involve federal causes of action for which equitable *tolling* may apply, but the Minnesota doctrine of fraudulent concealment is an equitable *estoppel*. *See id.* (*citing Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323 (8th Cir. 1995), *Moratzka v. Pomaville (In re Pomaville)*, 190 B.R. 632 (Bankr. D. Minn. 1995), *and Ramette Range Mental Health Ctr., Inc. (In re Russ)*, No. 87-2332, 1997 WL 188449 (Bankr. D. Minn., April 18, 1997)); *see also Dring*, 58 F.3d at 1328-31 (identifying difference between equitable tolling and equitable estoppel based on fraudulent concealment). And Minnesota law is well settled that equitable estoppel only applies to bar a statute-of-limitations defense when the *defendant* acts to conceal the cause of action. *See, e.g., Kopperud v. Agers*, 312 N.W.2d 443, 446-47 (Minn. 1981)("[W]hen the suit is for another claim [than common-law fraud] the statute begins to run from the wrong but is tolled by *defendant's* fraudulent conduct." Italics added.); *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976)("If a *party* conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such facts were expressly denied." Italics added.).

*Curtis v. Altria Group, Inc.* does not hold otherwise. *See* 792 N.W.2d 836, 842 (Minn. App. 2010) *rev. granted* (Minn., March 15, 2011). In *Curtis*, the plaintiffs alleged that Philip Morris marketed Marlboro Lights as "healthier" despite knowing that consumers would likely derive no health benefit from their use when compared to regular Marlboros. In other words, the defendant was responsible for the concealment in *Curtis*, and the court's recitation of Minnesota law in that case reiterated that this is an essential aspect of Minnesota law. *See id.* at 861 (citing *Kopperud*, 312 N.W.2d 443 (Minn. 1981) and *Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976)); *see also Kopperud*, 312 N.W.2d at 446-47; *Sjogren*, 309 Minn. at 365, 244 N.W.2d at 650.

The Trustee does not direct this court's attention to any authority in which a limitations period that was rooted in Minnesota law was tolled by the fraudulent concealment of someone *other than* the defendant. (*See generally*, Omnibus Memorandum, 32-40).

## II. The Trustee's Complaint should be dismissed with respect to Alan Miller's $2 million principal loan, because Miller's good-faith defense is evident from the face of the complaint.

Taken at face value, the Trustee's Complaint alleges that Alan Miller received a 9% return (18% annualized) on a single short-term $2 million loan. (Complaint, 9). Such a return is hardly "too good to be true," when compared to market rates, nor does that single transaction reflect a "pattern of abnormally consistent and significant profitability" that was "not credible" on its face, as the Trustee claims. (*See id.* at 9-10). In fact, Minnesota courts have consistently recognized that such rates are commercially reasonable. *See, e.g., Peterson v. Gustafson*, 584 N.W.2d 660, 661-64 (Minn. App. 1998) (18 percent not usurious, allowable in attorney-retainer agreement); *Monarch Turf Supply v. Reliance Ins. Co.*, (C5-95-2377) 1996 Minn. App. LEXIS 774, *1-2 (July 2, 1996) (18 percent interest on bond).

The Trustee's conclusory factual averments about the adversary defendants' alleged notice of "indicia of fraud" are thus contradicted by the specific facts alleged with respect to Alan Miller.  This court may therefore dismiss the Trustee's claims as against Alan Miller, because his built-in good-faith defense is clear on the face of the complaint; the complaint is therefore self-defeating as to Miller.  5B Wright & Miller, Fed. Prac. & Proc. Civ. § 1357 (3d ed. 2010) ("As the case law makes clear, the complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy; but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion.  * * * In [such a] situation[] the complaint is said to have a built-in defense and is essentially self-defeating.").

The cases on which the Trustee relies are distinguishable with respect to Alan Miller. *Picard v. Estate of Stanley Chais (In re Madoff Inv. Sec., LLC)*, for example, involved family members of Stanley Chais and entities that Chais controlled.  *See Picard*, (No. 08-01789, Adv. No. 09-1172), 2011 Bankr. LEXIS 606, *5-7 (S.D.N.Y. Bankr., Feb. 24, 2011).  Chais was a "sophisticated investment advisor" who had been "closely associated" with Bernard Madoff since the 1970s.  *Id.* at *5.  The Chais-related defendants argued (in a Rule 12(b)(6) motion) that they were entitled to restitution of their principal because they were innocent investors.  *Id.* at *34-40.  The court rejected the Chais-related defendants' arguments because it concluded that the complaint had adequately pled that they were not innocent investors.  *See id.*  But this was because of their close relationships with Chais, coupled with the "fantastical" annual returns, most of which were in excess of 50 percent, and some of which were more than 100 percent.  *Id.* at *24-27.  There are no equivalent facts alleged with respect to Alan Miller.

Instead, Alan Miller's single short-term $2 million loan resulted in a modest 9 percent return (18 percent annualized). (Complaint, 9). This rate was well within Minnesota law. *See* Minn. Stat. § 334.01, Subd. 2 (2010) (setting no ceiling on interest rates for loans in excess of $100,000. And such rates have been consistently approved of by Minnesota courts. *See, e.g., Peterson*, 584 N.W.2d at 661-64 (18 percent not usurious, allowable in attorney-retainer agreement); *Monarch Turf Supply*, (C5-95-2377) 1996 Minn. App. LEXIS 774, *1-2 (18 percent interest on bond).

The complaint pleads no facts from which the court could conclude that Alan Miller was on notice of Petters' fraud. Miller's good-faith affirmative defense is obvious from the face of the complaint, and the complaint should therefore be dismissed insofar as it seeks to obtain return of Miller's $2 million principal loan.

## CONCLUSION

The Trustee's claims against Alan Miller are barred by the statute of limitations. Furthermore, Miller has an affirmative defense that is plain on the face of the Trustee's Complaint, and thus this court should dismiss the Trustee's claim for return of Miller's $2 million principal.

Dated this 13th day of May, 2011.

JOSEPH S. FRIEDBERG, CHARTERED

/e/Joseph S. Friedberg
Joseph S. Friedberg #32086
701 Fourth Avenue South, Suite 300
Minneapolis, MN 55412
Ph: 612-235-4820
joefriedberg@hotmail.com

and

JANSEN & PALMER, LLC

/e/Jenneane L Jansen
Jenneane L. Jansen #236792
4746 Elliot Avenue South
Minneapolis, MN  55407
Ph:  612-823-9088
jenneane@jansenpalmer.com



**Monarch Turf Supply, Respondent, vs. Reliance Insurance Company, Appellant.**

**C5-95-2377**

**COURT OF APPEALS OF MINNESOTA**

*1996 Minn. App. LEXIS 774*

**July 2, 1996, Filed**

**NOTICE:**      [*1]  THIS OPINION WILL BE UN-PUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**PRIOR HISTORY:**      Hennepin County District Court. File No. 955013. Hon. Harry S. Crump.

**DISPOSITION:**      Affirmed.

**COUNSEL:** Christopher S. Hayhoe, Christopher P. Chilstrom, Felhaber, Larson, Fenlon & Vogt, P.A, 4200 First Bank Place, 601 Second Avenue South, Minneapolis, MN 55402 (for Respondent).

M. T. Fabyanske, Richard G. Jensen, Fabyanske, Svoboda, Westra & Hart, P.A., 920 Second Avenue South, #1100, Minneapolis, MN 55402 (for Appellant).

**JUDGES:** Considered and decided by Huspeni, Presiding Judge, Klaphake, Judge, and Holtan, Judge. *

   *   Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

**OPINION BY:** HOLTAN

**OPINION**

   **UNPUBLISHED OPINION HOLTAN,** Judge

   Appellant Reliance Insurance Company challenges the trial court's finding that respondent Monarch Turf Supply filed a timely notice of payment bond claim under *Minn. Stat. § 574.31* (1990), and the trial court's order requiring appellant to pay the principal sum plus 18 percent interest per annum for materials supplied by res-

pondent to a [*2]  publicly-funded project for which appellant had issued a payment and performance bond. We affirm.

   **FACTS** The relevant facts underlying this appeal are largely undisputed. On October 17, 1989, Hennepin County entered into a construction contract with Knutson Construction. Pursuant to the contract, Knutson Construction agreed to supply all labor, materials and services necessary to construct a project known as the Brooklyn Park Waste Transfer Station. In accordance with the Minnesota Public Contractors' Performance and Payment Bond Act, appellant issued a payment and performance bond on behalf of Knutson Construction.

   One of Knutson Construction's subcontractors on the project was Noble Nursery. Noble Nursery performed landscaping work on the project in the fall of 1990. Respondent provided Noble Nursery with the sod used. Knutson Construction paid Noble Nursery in full for all work and materials it provided for the project; however, Noble Nursery, which filed for bankruptcy on August 11, 1991, failed to pay respondent the principal sum of $ 22,858 for its sod.

   During January, February, and March 1991, respondent had periodic telephone contact with Knutson Construction's [*3]  project manager regarding Noble Nursery's failure to pay respondent for its sod. By letter dated April 30, 1991, respondent wrote the project manager that Noble Nursery continued to be in default on respondent's invoices, and requested payment from Knutson Construction. During this time, respondent also had telephone contact with Hennepin County's project manager, notifying him that respondent had not received payment from Noble Nursery for its sod.

   By letter dated March 20, 1991, Hennepin County's project manager wrote Knutson Construction's project

manager that it could not issue "this Final Payment for construction of the Brooklyn Park Transfer Station" until several items were completed/received (e.g. "executed Certificate of Substantial Completion," "consent of Surety to Final Payment," "proof of the resolution of the two mechanics' lien claims," and rewiring of roof vents). According to the trial testimony of Hennepin County's project manager, these requests were satisfied in April 1991.

A memorandum from Hennepin County's project manager, dated April 30, 1991, noted that Knutson Construction Company "has finished all work required of them. Final payment (Change Order No. [*4] 47) was made on April 15, 1991." In addition, it stated that only "minor warranty items remain. It is therefore appropriate to closeout the Retainage Account." Hennepin County authorized release of the balance being held in the securities retainage account on May 3, 1991, and advised Knutson Construction of the release of the remaining retainage by letter dated May 23, 1991: "Hennepin County is releasing the remaining $ 20,000.00 from this account which will allow its closure and the termination of the agreement."

Hennepin County's project manager testified that as of May 3, 1991, he had accepted Knutson Construction's performance under the contract and that Knutson's only remaining obligation under the contract was to honor its warranties. Also, the City of Brooklyn Park had issued Hennepin County a Certificate of Occupancy in 1990, and Hennepin County had been occupying and using the project for its intended purpose since summer 1990.

By letter dated May 16, 1991, Hennepin County's project manager demanded that Knutson Construction replace, by August 6, 1991, some dead plantings at the project that were covered under warranty. As of October 16, 1991, Knutson Construction had not [*5] replaced the dead plantings and Hennepin County's project manager again wrote to Knutson Construction demanding replacement of the plantings. The demand for completion of the work was made again by letter dated November 19, 1991. Knutson Construction then employed Wilson Nursery to complete the work, which was finished on November 26, 1991. [1]

> 1    The bond provides that it "shall cover any and all warranty, guarantee or corrective periods which are specifically set forth in the contract documents and shall be in effect throughout the duration of each and every such period."

Respondent filed its notice of bond claim with the Hennepin County Auditor on August 26, 1991. Respondent commenced this lawsuit on May 5, 1992, asserting a bond claim against appellant under the Minnesota Per-

formance and Payment Bond Act, *Minn. Stat. §§ 574.26-.31 (1990)* for materials supplied to a publicly-funded project for which appellant had issued a payment and performance bond.

After a bench trial, the trial court found that respondent [*6] properly complied with the notice requirements of *Minn. Stat. § 574.31* and held that appellant was liable to respondent for the principal sum of $ 22,858, plus interest at the rate of 18 percent per annum and costs and attorney fees. In a subsequent order, the trial court awarded respondent $ 11,594 in attorney fees and $ 399.37 in costs and disbursements. Appellant made a motion for a new trial or, in the alternative, for amended findings of fact, conclusions of law and order for judgment. The trial court denied appellant's motion. Appellant appeals from the trial court's denial of this motion and requests that the trial court's decision be reversed and the case remanded for judgment in favor of appellant.

**DECISION**    Ordinarily, the decision to grant a new trial does lie within the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion.

*Halla Nursery v. Baumann-Furrie & Co., 454 N.W.2d 905, 910 (Minn. 1990).* The standard of review for a trial court's findings is whether they are clearly erroneous. *First Trust Co. v. Union Depot Place, 476 N.W.2d 178, 181 (Minn. App. 1991)*, **review denied** [*7] (Minn. Dec. 13, 1991).

At the time respondent filed its bond claim, *Minn. Stat. § 574.31 (1990)*, [2] provided:

> 2    *Minn. Stat. § 574.31* has since been amended.

No action shall be maintained on any such bond unless within 90 days after the completion of the contract and acceptance thereof by the proper public authorities, the claimant shall file a written notice * * * in the office of the auditor of the county letting the contract * * * .

Strict compliance with the notice requirement is a condition precedent to the maintenance of an action against a surety on a contractor's bond. *Spetz & Berg, Inc. v. Luckie Constr. Co., 353 N.W.2d 233, 235 (Minn. App. 1984)*, **review denied** (Minn. Nov. 9, 1984). The statute of limitations, however, does not begin to run until there has been both completion and acceptance of the contract. *Wheeler Lumber Bridge & Supply Co. v. Seaboard Surety Co., 218 Minn. 443, 447, 16 N.W.2d 519, 521 (1944)*.

In its order for judgment, the trial [*8] court concluded that respondent complied with the applicable statutory requirements, noting:

Knutson did not complete performance of its contract with Hennepin County more than 90 days in advance of the date that [respondent] filed its notice of public contractor's bond claim on August 26, 1991. Knutson did not complete performance of that contract until November 26, 1991.

In the memorandum to its order for judgment, the trial court, relying on *Guaranteed Gravel & Sand Co. v. Aetna Casualty & Surety Co.*, 174 Minn. 366, 219 N.W. 546 (1928), explained:

Minn. Stat. *Sec. 574.31* (1990) makes no distinction in terms of "completion of the contract" between "warranty" or "non-warranty" work. Knutson had not completed performance on that contract until November 26, 1991, when the original deficiency in its tree installation was finally corrected. That work satisfied the project manager for Hennepin County and was deemed acceptance (finally) of the completion of performance on the contract.

Appellant contends the trial court erred in its determination that warranty obligations extended the date of completion and acceptance of the contract until November 26, 1991, [*9] because final completion and acceptance had already occurred on May 3, 1991, arguing (1) when Hennepin County made final payment to Knutson Construction on April 15, 1991, the project was completed according to the terms of the contract and the payment constituted a waiver of all claims other than certain specific claims such as warranty work, (2) Hennepin County's acceptance of the project was demonstrated by its release of retainages to Knutson Construction authorized on May 3, 1991, and its letter to Knutson Construction dated May 23, 1991, noting: "Hennepin County is releasing the remaining $ 20,000.00 from this account which will allow its closure and the termination of the agreement," (3) Hennepin County's project manager testified he had accepted Knutson Construction's performance under the contract as of May 3, 1991, and Knutson's only remaining obligation under the contract then was to honor its warranties, (4) Hennepin County had been issued a Certificate of Occupancy by the City of Brooklyn Park in 1990, and (5) Hennepin County had been occupying and using the project for its intended purpose since summer 1990.

In *Guaranteed Gravel*, a contractor failed to [*10] complete certain items required under a contract. *174 Minn. at 368-69, 219 N.W. at 547*. The plaintiffs asserted payment bond claims against the defendant surety on a public contractor's bond. *Id.* The surety argued that the plaintiff's notices were untimely because they were not filed within the specified 90-day time period. *Id.* Specif-

ically, the surety argued that the contractor's work upon which the plaintiffs relied to establish timeliness was not work necessary to complete initial construction. *Id. at 369-70, 219 N.W. at 547-48*. The court described the situation as follows:

It is claimed that the work necessary on the roof was repair work covered by the guaranty, but not due to a failure to properly construct in the first instance. This is disputed by plaintiffs. We think the evidence * * * supports the apparent conclusion of the trial court that the roof work was necessary because of failure to properly and completely construct, and not a necessary repair attributable to or made necessary by use.

* * * We conclude that the evidence supports the finding that the physical structure of the building was not completed 90 days prior to the service [*11] of the notice, nor had the contract been completed at that time.

*Id.*

Similarly, we find that the replacement of plantings in this case was necessary because of an original deficiency, thereby delaying completion and acceptance of the project until the original deficiency was corrected on November 26, 1991, and rendering respondent's notice of bond claim, filed on August 26, 1991, timely. It is noteworthy that Hennepin County accepted the project subject to Knutson Construction's contractual obligations to honor its warranties, and that Knutson Construction and Hennepin County both knew at the time of purported acceptance of the contract of the need for replacement of the dead plantings pursuant to Knutson Construction's warranty agreement, preventing the contract's completion.

The trial court also ordered:

[Appellant] shall pay to [respondent] the principal sum of $ 22,858.00, plus interest of 18% per annum from December 9, 1990 [as allegedly specified in respondent's contract with Noble Nursery].

Appellant argues that respondent failed to prove that either Knutson Construction or appellant had any contractual obligation to pay interest at such a rate. [*12] Consequently, appellant maintains that to the extent respondent may arguably be entitled to recover any interest, such interest is limited by the prejudgment interest statute, *Minn. Stat. § 549.09* (1994). Respondent's principal, however, testified that Noble Nursery agreed to pay interest at the rate of 18 percent per annum, and this was a contractual commitment. We see no reason to dispute the trial court's rationale.

**Affirmed.**



**In re: BERNARD L. MADOFF INVESTMENT SECURITIES LLC, Debtor.
IRVING H. PICARD, as Trustee for the Liquidation of BERNARD L. MADOFF
INVESTMENT SECURITIES LLC, Plaintiff, v. ESTATE OF STANLEY CHAIS, et
al., [1] Defendants.**

> 1    Defendant Stanley Chais passed away during the pendency of this action. See Suggestion of Death of Defendant Stanley Chais (Dkt. No. 85). As a result, Stanley Chais has been substituted by the Estate of Stanley Chais, and the caption above reflects such change. See Stipulation and Order Substituting Party (Dkt. No. 88). The complete caption, as amended, is attached hereto as Exhibit A.

**SIPA LIQUIDATION No. 08-01789 (BRL) (Substantively Consolidated), Adv. Pro.
No. 09-1172 (BRL)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*445 B.R. 206; 2011 Bankr. LEXIS 606; 54 Bankr. Ct. Dec. 103*

**February 24, 2011, Decided**

**PRIOR HISTORY:** *Picard v. Chais (In re Bernard L. Madoff Inv. Secs. LLC), 440 B.R. 282, 2010 Bankr. LEXIS 4076 (Bankr. S.D.N.Y., 2010)*

**COUNSEL:** [*1] For Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, Plaintiff: BAKER & HOSTETLER LLP, New York, NY, By: David J. Sheehan, John Moscow, Marc E. Hirschfield, Oren J. Warshavsky, Seanna R. Brown.

For Emily Chasalow, Mark Chais, Wrenn Chais, William Chais, Miri Chais and the Entities Identified on Exhibit 1 to the Notice of Motion to Dismiss, Defendants: SILLS CUMMIS & GROSS P.C., New York, NY, By: Philip R. White, Andrew H. Sherman.

**JUDGES:** Before: Hon. Burton R. Lifland, United States Bankruptcy Judge.

**OPINION BY:** Burton R. Lifland

**OPINION**

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS TRUSTEE'S COMPLAINT**

Before the Court is the motion (the "Motion to Dismiss") of defendants Emily Chasalow, Mark Chais, Wrenn Chais, William Chais, Miri Chais, and other related entities (collectively, the "Moving Defendants") seeking to partially dismiss the complaint (the "Complaint") of Irving H. Picard, Esq. (the "Trustee" or "Plaintiff"), trustee for the substantively consolidated Securities Investor Protection Act [2] ("SIPA") liquidation of Bernard L. Madoff Investment Securities [*2] LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), filed pursuant to SIPA *sections 78fff(b)* and *78fff-2(c)(3), sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a)* and *551 of the Bankruptcy Code* (the "Code"), various sections of New York Debtor and Creditor Law [3] (the "NYDCL") and other applicable law for turnover, accounting, preferences, fraudulent conveyances, damages, and objections to SIPA claims.

> 2    *15 U.S.C. § 78aaa et seq.* References to sections of SIPA hereinafter shall replace "15 U.S.C." with "SIPA."

Case 10-04256   Doc 13   Filed 05/13/11   Entered 05/13/11 14:31:50   Desc Main
Document   Page 14 of 35

Page 2

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

3   *N.Y. Debt. & Cred. Law § 270 et seq.* (McKinney 2010).

The Moving Defendants assert that the Complaint fails to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure ("Rule") 12(b)(6)*, made applicable herein by *Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012*, with respect to ten of the eleven counts asserted, and it should therefore be partially dismissed. The Moving Defendants do not seek to dismiss Count Two of the Complaint, which seeks the return of $46 million in allegedly preferential transfers.

For the reasons set forth below and at oral argument, the Motion to Dismiss is GRANTED in part and DENIED in part. Specifically, the  [*3] Motion to Dismiss is GRANTED with respect to Count One of the Complaint, seeking immediate turnover under *section 542* of the Code and SIPA *section 78fff-2(c)(3)*. The Motion to Dismiss is DENIED with respect to Counts Three through Eleven of the Complaint.

## BACKGROUND[4]

4   A comprehensive discussion of the facts underlying this SIPA liquidation and Madoff's notorious Ponzi scheme is set forth in this Court's March 1, 2010 net equity decision (the "Net Equity Decision"). *See Sec. Investor Prot. Corp. v. BLMIS (In re BLMIS), 424 B.R. 122, 125-33 (Bankr. S.D.N.Y. 2010).*

The Complaint arises in connection with the infamous Ponzi scheme perpetrated by Bernard L. Madoff for decades through his investment company, BLMIS. As recognized by the Securities Investor Protection Corporation ("SIPC"), and as relayed in this Court's recent decision in *Picard v. Merkin*, [5] "this is not a typical SIPC proceeding in which securities or cash were on hand at the time of the failure of the brokerage house." Letter from Stephen P. Harbeck, President of SIPC to the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises at p. 6 (dated Sept. 7, 2010) [hereinafter "SIPC Letter"]. Rather, it was  [*4] a fraud of unparalleled magnitude "in which the only assets were other people's money or assets derived from such funds." *Id.* During the course of this fraud, there were approximately 90,000 disbursements of fictitious profits to Madoff investors totaling $18.5 billion. *Id.* at p. 5. Due to the longstanding nature of the Ponzi scheme, many of the customer accounts presented multiple generational investments, requiring the Trustee to conduct a full forensic analysis of all of BLMIS's books and records, dating back to at least the early 1980s. *Id.* at p. 7. As of February 18, 2011, the Trustee has determined 16,267 claims, denied 2,740 claims (and 10,731 third party claims), and allowed

2,403 claims in the amount of $6,854,549,449.81. Moreover, SIPC has committed $791,149,690.14 in SIPC advances. *See* http://www.madofftrustee.com (last visited Feb. 23, 2011). The Trustee has reviewed, and continues to review, millions of documents to determine the thousands of customer claims filed in this SIPA liquidation. SIPC Letter at p. 7.

5   *Picard v. Merkin (In re BLMIS), 440 B.R. 243 (Bankr. S.D.N.Y. 2010).*

## I. THE MOVING DEFENDANTS

In the instant Complaint, the Trustee seeks to recover over $1 billion  [*5] in preferential payments and fraudulent transfers from the Moving Defendants, Stanley Chais, and other nonmoving defendants (collectively, the "Defendants").

Each of the Moving Defendants is connected with defendant Stanley Chais, [6] a sophisticated investment advisor who has been closely associated with Madoff since the 1970s. Prior to Madoff's arrest, Stanley Chais invested in BLMIS for over three decades through more than 60 entity and/or personal accounts. From his investments with BLMIS, Stanley Chais purportedly withdrew hundreds of millions of dollars of other investors' money, funneling much of it to his children and their spouses, his grandchildren, and various entities he created for the benefit of his family. He is the settlor and trustee for many of the trust defendants named in the Complaint, as well as the general partner and investment advisor to defendants The Brighton Company, The Lambeth Company, and The Popham Company (the "Chais Funds"), who have not moved to dismiss the Complaint. As the general partner of the Chais Funds, which invested heavily in BLMIS, Stanley Chais collected management fees equal to 25% of each Chais Funds' entire net profit for every calendar  [*6] year in which profits exceeded 10%, which has occurred every calendar year since at least 1996. The Trustee asserts that by virtue of, *inter alia*, his close and personal relationship with Madoff and expertise as an investment advisor, Stanley Chais knew or should have known that BLMIS was predicated on fraud.

6   Stanley Chais did not move to dismiss the complaint, but rather answered and filed counterclaims against the Trustee. The Trustee filed a motion to dismiss these counterclaims, which was granted in its entirety on November 30, 2010. *See Picard v. Chais, et al. (In re BLMIS), 440 B.R. 282 (Bankr. S.D.N.Y. 2010)* (Dkt. No. 86).

The Moving Defendants consist of two groups, all of whom held accounts allegedly directed and controlled by Stanley Chais: (1) family members of Stanley Chais and (2) related entities of Stanley Chais. The family members

include Stanley Chais's daughter, Emily Chasalow, [7] his two sons, Mark Chais and William Chais, and their wives, Miri Chais [8] and Wren Chais, respectively (the "Family Defendants"). The related entities include trusts and other entities that Stanley Chais purportedly created for the benefit of his family (the "Entity Defendants"). [9] Aside from [*7] Miri Chais, the Family Defendants are trustees and/or directors of these Entity Defendants. The Trustee asserts that all of the Moving Defendants were clients of the investment advisory business (the "IA Business") and maintained the BLMIS accounts highlighted in Exhibit A to the Complaint (the "IA Accounts"). Compl. at ¶ 93; *see also id.* at Ex. A.

[7]   Defendant Emily Chasalow is married to defendant Michael Chasalow, who filed a separate motion to dismiss the Complaint. The parties have consented by stipulation entered January 18, 2011 that the Trustee will amend the Complaint as to Michael Chasalow, at which time Michael Chasalow's motion to dismiss will be deemed withdrawn without prejudice. *See* Stipulation and Order Granting Leave to File Amended Complaint (Dkt. No. 89).

[8]   Defendant Miri Chais also separately filed a motion to dismiss before this Court, which was denied in its entirety on November 30, 2010. *See Picard v. Chais, et al., (In re BLMIS), 440 B.R. 274 (Bankr. S.D.N.Y. 2010)* (denying motion to dismiss for lack of personal jurisdiction) (Dkt. No. 87).

[9]   The Entity Defendants are: Unicycle Trading Company, Unicycle Corporation, Emily Chais Trust No. 2, Emily Chais Trust No. 3, [*8] Emily Chais 1983 Trust, Emily Chais Issue Trust No. 1, Emily Chais Issue Trust No. II, Benjamin Paul Chasalow Transferee Trust No.1, Benjamin Paul Chasalow 1999 Trust, Rachel Allison Chasalow Transferee Trust No. 1, Rachel Allison Chasalow 1999 Trust, Justin Robert Chasalow Transferee Trust No. 1, Justin Robert Chasalow 1999 Trust, Onondaga, Inc. Pension Plan, William Frederick Chais Trust No. 2, William Frederick Chais Trust No. 3, William Frederick Chais 1983 Trust, William Frederick Chais Issue Trust No. I, William Frederick Chais Issue Trust No. II, Madeline Chais Transferee Trust No. I, Madeline Celia Chais 1992 Trust, Chloe Frances Chais Transferee Trust No. I, Chloe Frances Chais 1994 Trust, Jonathan Chais Transferee Trust No. I, Jonathan Wolf Chais 1996 Trust, Mark Hugh Chais Trust No. 2, Mark Hugh Chais Trust No. 3, Mark Hugh Chais 1983 Trust, Mark Hugh Chais Issue Trust No. I, Mark Hugh Chais Issue Trust No. II, Tali Chais Transferee Trust No. I, Tali Chais 1997 Trust, Ari Chais Transferee Trust No. I, Ari Chais 1999 Trust, 1994 Trust for the Children of Stanley and Pamela Chais, 1996 Trust for the Children of Stanley and Pamela Chais, William & Wrenn Chais 1994 Family Trust, [*9] 1999 Trust for the Grandchildren of Stanley and Pamela Chais, Chais Investments, Ltd., Onondaga, Inc., Chais Management, Ltd., Chais Management, Inc., and Chais Venture Holdings.

## II. THE COMPLAINT

The Complaint, filed on May 1, 2009, seeks to avoid and recover preferential and fraudulent transfers made to or for the benefit of the Defendants as initial or subsequent transferees pursuant to *sections 544, 547, 548, 550,* and *551 of the Bankruptcy Code* (the "Code") and various sections of New York Debtor and Creditor Law (the "NYDCL"). The Complaint additionally seeks turnover and accounting under *section 542* of the Code and SIPA *section 78fff-2(c)(3)* and objects to Defendants' SIPA claims, which the Trustee asserts should be disallowed under *section 502(d)* of the Code and because they are not supported by the books and records of BLMIS.

The following facts alleged in the Complaint, presented in the light most favorable to the Trustee, are assumed to be true for purposes of the Motion to Dismiss. Between December 1, 1995 and December 11, 2008 (the "Filing Date"), [10] BLMIS allegedly made transfers to the Defendants in excess of $1 billion (the "Transfers"). Of these Transfers, $804 million [*10] was transferred within six years of the Filing Date (the "Six Year Transfers"); $377 million was transferred within two years of the Filing Date (the "Two Year Transfers"); and $46 million was transferred within ninety days of the Filing Date (the "Ninety Day Transfers"). The particular details of these transactions from BLMIS to the Defendants as initial transferees--including the date, transferee, and amount transferred--are highlighted in Exhibit B to the Complaint ("Exhibit B"). The Complaint then provides that "some or all of the[se] Transfers were subsequently transferred . . . to Defendant Chais and/or other Defendants in the form of payment of commissions or fees, transfers from one account to another, or other means" (collectively, the "Subsequent Transfers"). *See* Compl. at ¶ 166.

[10]   *See SIPA § 78lll(7)(B)* (defining the "Filing Date").

The Trustee asserts that the Moving Defendants, independently or through Stanley Chais, knew or should have known that BLMIS was predicated on fraud and failed to exercise reasonable due diligence into BLMIS. In support of this assertion, the Trustee alleges that the Moving Defendants were on notice of, *inter alia,* the following indicia of irregularity [*11] and fraud: (1) the

Case 10-04256    Doc 13    Filed 05/13/11    Entered 05/13/11 14:31:50    Desc Main
                    Document        Page 16 of 35

Page 4

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

Moving Defendants' accounts, directed and controlled by Stanley Chais, received fantastical rates of return from 1996 through 2007, including 125 instances of returns exceeding 50%, more than 35 instances of returns exceeding 100%, and one instance of returns exceeding 300%; (2) losses were manufactured after the dates when the subject transactions purportedly took place, including a purchase and sale of 125,000 shares of Micron Technology Inc. for a loss of more than $1 million appearing for the first time on a date 150 days after the purported purchase; (3) purported losses were generally remedied in subsequent periods with monumental rates of return that far outpaced the market, including a rebound in one Moving Defendant's account from negative 89% returns in 2003 to positive 165% returns the following year; (4) financial industry press reports questioned the legitimacy of BLMIS and Madoff and their ability to achieve promised consistent returns, and many banks and advisors refused to deal with BLMIS and Madoff; (5) BLMIS lacked transparency to investors, regulators, and other outside parties by failing to provide customers with real-time online access to their [*12] accounts and excluding an independent custodian of securities; and (6) BLMIS, one of the world's largest hedge funds, was supposedly audited by Friehling & Horowitz, an accounting firm with only three employees, one of whom was semi-retired, with offices located in a strip mall. [11] Compl. at ¶¶ 103-04.

> [11]   David Friehling is the subject of a criminal information filed by the United States alleging, *inter alia*, securities fraud. *See* Friehling Information, *United States v. Friehling*, No. 09-CR-0700 (AKH) (S.D.N.Y. July 17, 2009) (Dkt. No. 14). He has since pled guilty, and sentencing has been adjourned to March 18, 2011 due to continuing cooperation. *Id.* at Dkt. No. 43.

## STANDARD OF REVIEW -- MOTION TO DISMISS UNDER *RULE 12(b)(6)*

*Rule 12(b)(6)* allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." *FED. R. CIV. P. 12(b)(6)*. When considering a motion to dismiss under *Rule 12(b)(6)*, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007);* [*13] *E.E.O.C. v. Staten Island Sav. Bank, 207 F.3d 144, 148 (2d Cir. 2000).*

To survive a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *FED. R. CIV. P.*

*8(a)(2); FED. R. BANKR. P. 7008.* However, a recitation of the elements of the cause of action, supported by mere conclusory statements, is insufficient. *Iqbal, 129 S. Ct. at 1949* ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Rather, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id. at 1950*. A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. at 1949*. In determining plausibility, this Court must "draw on its judicial experience and common sense," *id. at 1950*, to decide whether the factual allegations "raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555*.

In contrast, allegations of fraud are held to the higher pleading standard of *Rule 9(b)*, requiring a party to  [*14] "state with particularity the circumstances constituting fraud." *FED. R. CIV. P. 9(b); FED. R. BANKR. P. 7009(b).* *Rule 9(b)* permits, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind" be pled generally. *FED. R. CIV. P. 9(b).* In applying this heightened pleading requirement where applicable, this Court is mindful of the vastness and complexity of the Trustee's investigation of the Madoff Ponzi scheme, and the disadvantage the Trustee faces in pleading fraud against multiple defendants. It has been held that courts will take a "liberal" approach in construing allegations of actual fraud asserted by a bankruptcy trustee on behalf of all creditors of an estate. *Pereira v. Grecolas Ltd., et al. (In re Saba Enters., Inc.), 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009); Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.), 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002), leave to appeal denied by 288 B.R. 52 (S.D.N.Y. 2002)*. Courts have found that "[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases, because . . . it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the [*15] fraud on secondhand knowledge for the benefit of the estate and all of its creditors." *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (citing Atlanta Shipping Corp., Inc. v. Chem. Bank, 631 F. Supp. 335, 348 (S.D.N.Y. 1986), aff'd 818 F.2d 240 (2d Cir. 1987)).* Consistent with the foregoing, as the Trustee is pleading from secondhand knowledge, "allegations of circumstantial evidence are sufficient to establish fraudulent intent." *In re Saba Enters., Inc., 421 B.R. at 643*. Moreover, as "the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time, the trustee's handicap increases," and he should therefore be afforded "even greater latitude." *Stratton Oakmont, Inc., 234 B.R. at 310 (citing A.I.A. Holdings, S.A. v. Lehman Bros., Inc., No. 97-CIV-4978*

Case 10-04256    Doc 13    Filed 05/13/11    Entered 05/13/11 14:31:50    Desc Main
Document    Page 17 of 35

Page 5

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

(LMM), 1998 U.S. Dist. LEXIS 4175, 1998 WL 159059, at *6 (S.D.N.Y. Apr. 1, 1998)).

## DISCUSSION

### I. THE TRUSTEE HAS SUFFICIENTLY PLED ACTUAL FRAUD PURSUANT TO THE CODE AND THE NYDCL

The Trustee has sufficiently pled Count Three of the Complaint pursuant to *sections 548(a)(1)(A)*, *550* and *551* of the Code and Counts Five and Nine pursuant to *sections 276*, [*16] *276-a*, *278*, and *279* of the NYDCL, in conjunction with *sections 544*, *550* and *551* of the Code, to avoid and recover actual fraudulent transfers. [12]

> 12    A SIPA trustee's authority to utilize these sections of the Code and the NYDCL derives from *SIPA sections 78fff(b)* and *78fff-2(c)(3)*. *SIPA section 78fff(b)* provides that "[t]o the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though, it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." *SIPA § 78fff(b)*. Similarly, *SIPA section 78fff-2(c)(3)* allows a SIPA trustee to utilize the avoidance powers enjoyed by a bankruptcy trustee: "Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11." *SIPA § 78fff-2(c)(3)*.

### A. THE TRUSTEE'S CLAIMS FOR ACTUAL FRAUD UNDER *SECTIONS 548(A)(1)(A)*, *550* AND *551* OF THE CODE ARE SUFFICIENTLY PLED

Under [*17] the Code, "the trustee may avoid any transfer . . . of an interest of the debtor in property . . . made or incurred on or within 2 years before the date of the filing of the petition, if the debtor . . . made such transfer . . . with actual intent to hinder, delay or defraud." *11 U.S.C. § 548(a)(1)(A)*. To adequately plead such a claim, the complaint must state with particularity the factual circumstances constituting fraud under *Rule 9(b)*. *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, *351 F. Supp. 2d 79, 106-07 (S.D.N.Y. 2004)*. To do this, the complaint must allege "(1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto." *In re Saba Enters., Inc.*, *421 B.R. at 640*. In contrast, fraudulent intent may be pled generally under *Rule 9(b)*. *FED. R. CIV. P. 9(b)*. Under the Code, the trus-

tee must show such intent on the part of the debtor-transferor. *11 U.S.C. § 548(a)(1)(A)* (requiring a showing by the trustee that "*the debtor* . . . made such transfer . . . with actual intent to hinder, delay, or defraud") (emphasis added); *Andrew Velez Constr., Inc. v. Consolidated Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, *373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007)*; [*18] *Gredd v. Bear Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, *310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002)* ("The operative requirement for a transfer to be avoided under this section is the *debtor's* actual fraudulent intent."). Thus, the intent of the transferee is irrelevant for purposes of pleading under *section 548(a)(1)(A)* of the Code. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin'l Techs. Ltd.)*, *337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005)*.

Contrary to the Moving Defendants' position, the Trustee has pled with particularity the identity of the Two Year Transfers and the Six Year Transfers sought to be avoided in accordance with *Rule 9(b)*. Exhibit B to the Complaint specifically identifies the date, account number, transferor, transferee, method of transfer, and amount of each of the Transfers that the Trustee has thus far identified. *See* Compl. at Ex. B. In addition, the Trustee alleges that the Transfers represent redemptions of both principal and fictitious profits. *Id.* at ¶ 106. The Six Year Transfers total $804 million, the Two Year Transfers total $377 million, and the Ninety Day Transfers total $46 million. [13] Compl. at ¶¶ 108-10. Therefore, the Trustee's allegations, [*19] together with Exhibit B, sufficiently identify the specific Transfers sought to be avoided in accordance with *Rule 9(b)*.

> 13    Notably, the Moving Defendants have not sought to dismiss Count Two of the Complaint seeking the return of the allegedly preferential Ninety Day Transfers, totaling $46 million.

Further, the Moving Defendants do not dispute that the Trustee has sufficiently alleged the intent of the transferor, BLMIS, for purposes of *section 548(a)(1)(A)* of the Code. It is now well recognized that the existence of a Ponzi scheme establishes that transfers were made with the intent to hinder, delay and defraud creditors. *See, e.g.*, *In re Bayou Group, LLC*, *439 B.R. 284, 306 n.19 (S.D.N.Y. 2010)* ("[W]here a Ponzi scheme exists, there is a presumption that transfers were made with the intent to hinder, delay and defraud creditors."); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, *397 B.R. 1, 8-14 (S.D.N.Y. 2007)* ("*Manhattan Inv. II*"). The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission. *See* Compl. at ¶ 1; Memorandum [*20] of Law in Support of the Defendants'

Case 10-04256   Doc 13   Filed 05/13/11   Entered 05/13/11 14:31:50   Desc Main
Document   Page 18 of 35

Page 6

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

Partial Motion to Dismiss ("Defs' Partial MTD") at p. 5; *see also Manhattan Investment II, 397 B.R. at 12* (relying on transferor's criminal guilty plea to establish the existence of a Ponzi scheme); *see also Johnson v. Neilson (In re Slatkin), 525 F.3d 805, 814 (9th Cir. 2008)* ("[A] debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent under *11 U.S.C. § 548(a)(1)(A)*."). Accordingly, BLMIS's fraudulent intent is established as a matter of law for purposes of the Trustee's Code-based actual fraudulent transfer claims.

Accordingly, the Trustee has sufficiently pled actual fraud under the Code, and the Motion to Dismiss Count Three is denied.

**B. THE TRUSTEE HAS SUFFICIENTLY ALLEGED ACTUAL FRAUD UNDER THE NYDCL**

Under the NYDCL, a trustee may avoid any "conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." *NYDCL § 276*. As under the Code, to adequately plead a claim to   [*21] recover actual fraudulent transfers under the NYDCL, the Complaint must state with particularity the factual circumstances constituting fraud under *Rule 9(b)*. *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 106, 107 (S.D.N.Y. 2004)*. As a preliminary matter, for the reasons set forth above in Section I, A, this Court finds that the Trustee has identified the Transfers sought to be avoided with particularity in accordance with *Rule 9(b)* and fraudulent intent on the part of BLMIS, the transferor, has been established by virtue of the Ponzi scheme presumption.

Unlike under the Code, under the NYDCL, courts differ as to whether the fraudulent intent of both the transferor and the transferee must be pled. While some courts have held that *section 276* requires a plaintiff to show intent to "hinder, delay, or defraud" simply on the part of the transferor, *see, e.g., Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 56 (2d Cir. 2005)* (citing *HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995)*); *Geron v. Schulman (In re Manshul Constr. Corp.), No. 97-CIV-8851 (JGK), 2000 U.S. Dist. LEXIS 12576, 2000 WL 1228866, at *46 (S.D.N.Y. Aug. 30, 2000)*   [*22] ("It is not necessary under *DCL § 276* to show fraudulent intent on the part of the transferee."); *Le Cafe Creme, Ltd. v. Le Roux (In re Le Cafe Creme, Ltd.), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000)*. The Moving Defendants' position that a plaintiff must also plead the *transferee's* fraudulent intent is likewise supported, *see, e.g., Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.), 361*

*B.R. 369, 396 (Bankr. S.D.N.Y. 2007)* ("[the debtor] must plead . . . the intent of the transferor and transferee []under NYDCL[].")"; *Picard v. Taylor (In re Park South Sec., LLC), 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005)* ("[U]nder *section 276* of the N.Y. D.C.L . . . the Trustee must establish both the debtor's *and* the transferee's actual fraudulent intent."). Assuming that a transferee's intent must also be pled under *section 276* of the NYDCL, the Court finds that the Complaint contains circumstantial evidence of fraudulent intent on the part of the Moving Defendants sufficient to raise the curtain for discovery into the Trustee's claims.

**i. THE TRUSTEE HAS SUFFICIENTLY PLED FRAUDULENT INTENT UNDER THE NYDCL ON THE PART OF THE FAMILY DEFENDANTS**

To adequately plead intent, the Trustee must   [*23] allege "facts that give rise to a strong inference of fraudulent intent." *Musicland Holding Corp. v. Best Buy Co., Inc. (In re Musicland Holding Corp.), 398 B.R. 761, 773 (Bankr. S.D.N.Y. 2008)* (quoting *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)*); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.), 379 B.R. 5, 17 (Bankr. E.D.N.Y. 2007)*. Such facts may either (1) demonstrate that defendants had both the motive and the opportunity to commit fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness. [14] *Official Comm. Of Asbestos Claimants of G-I Holding, Inc. v. Heyman, 277 B.R. 20, 36 (S.D.N.Y. 2002)*.

> 14   This two-prong test is commonly applied to analyze *scienter* in securities fraud actions, but the "same standard has been applied in [the Second] Circuit to non-securities fraud claims." *In re Musicland, 398 B.R. at 774 n.7* (applying the two-prong test to establish fraudulent intent under *section 544* of the Code and applicable state law); *see also Serova v. Teplen, No. 05-CIV-6748 (HB), 2006 U.S. Dist. LEXIS 5781, 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006)* ("This Circuit applies the same [two-prong] standard to pleading fraudulent intent   [*24] under common law fraud as to pleading scienter in securities fraud."); *G-I Holding, Inc., 277 B.R. at 36-37* (applying the two-prong test to establish fraudulent intent under *section 276* of the NYDCL); *In re Saba Enters., Inc., 421 B.R. at 641-42* (applying the two-prong test to establish fraudulent intent under *section 548(a)(1)(A)* of the Code).

The facts alleged in the Complaint "give rise to a strong inference" of the Family Defendants' "motive and . . . opportunity to commit fraud." *In re Saba Enters., Inc., 421 B.R. at 642*. With regard to motive, the Family De-

Case 10-04256   Doc 13   Filed 05/13/11   Entered 05/13/11 14:31:50   Desc Main
Document   Page 19 of 35

Page 7

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

fendants were receiving "fantastical," implausibly high and consistent rates of return, as well as millions of dollars in transfers of fictitious profits by continuing to participate in the fraud. Compl. at ¶ 103(b), Ex. B. Specifically, between 1996 and 2007, while the S&P 500 saw average annual returns of 10.72% and 52 months of negative returns, the Family Defendants, along with the Entity Defendants, "enjoyed more than 35 instances of supposed annual returns of more than 100% and more than 125 in which the annual returns purportedly exceeded 50%" with an average annual rate of return of over 39%. Compl. at ¶ 103(a), (b). [*25] In fact, the Family Defendants even "received drastically higher rates of returns than those reported for [other accounts Stanley Chais managed] during the same time periods." *Id.* at ¶ 103(b). Moreover, the Family Defendants reported anomalous "losses," sometimes purporting to lose almost the entire value of their accounts with a negative 95% annual rate of return, which were allegedly manufactured to provide significant tax benefits. *See id.* at ¶ 103(d).

Additionally, with regard to opportunity, the Family Defendants had a unique opportunity to benefit from Madoff's fraud by virtue of their strong familial ties to Stanley Chais, who was closely associated with Madoff. The Family Defendants are members of Stanley Chais's immediate family and innermost circle, consisting of his wife, his three children and their respective spouses. Stanley Chais completely controlled their accounts for "his personal interests and those of [the Family Defendants]." Compl. at ¶ 92. In turn, Stanley Chais was "closely associated with Madoff on both a business and social level since at least the 1970s"--so much so that Stanley Chais's telephone number was the first speed dial entry on a BLMIS telephone. Compl. [*26] at ¶¶ 33, 99. Stanley Chais thereby "enjoyed unusually intimate access to Madoff, allowing him an opportunity to gain special access to extensive information about the operations of BLMIS." *Id.* at 99. In light of the foregoing, it is plausible that the Family Defendants, who were closely related and connected to Stanley Chais and whose accounts were controlled by him, likewise had special access to inside information about BLMIS, and thus an exceptional opportunity to participate in, and benefit from, the fraudulent scheme.

While motive and opportunity are sufficient to infer fraudulent intent, the allegations in the Complaint additionally support a finding of "conscious misbehavior or recklessness." *In re Saba Enters., Inc., 421 B.R. at 642*. The allegations in the Complaint, accepted as true, demonstrate that Stanley Chais, who earned substantial fees in connection with his management of the Family Defendants' accounts, was consciously aware of the fraud. *See* Compl. at ¶ 97. Despite his sophisticated knowledge as an investment advisor, Stanley Chais, *inter alia*, (i) in-

structed Madoff to backdate trades and manufacture account losses for tax purposes; (ii) actively concealed BLMIS's [*27] role as money manager; (iii) and failed to investigate numerous indicia of fraud, including consistent and astronomical rates of return and BLMIS's lack of transparency. *See* Compl. at ¶¶ 99, 103, 104. Through their close familial ties to Stanley Chais, who controlled their accounts, it is plausible that the Family Defendants were similarly aware that BLMIS was predicated on fraud.

Accordingly, assuming the NYDCL requires it, the Trustee has sufficiently pled the Family Defendants' fraudulent intent such that discovery into the Trustee's claims is warranted. [15]

15   Many courts, including those in this district, accept the existence of "badges of fraud" as a means of alleging intent based on circumstantial evidence. *See In re Saba Enters., Inc., 421 B.R. at 643*; *Picard v. Taylor (In re Park South Sec., LLC), 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005)*. The badges include: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence [*28] or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transactions. *In re Saba Enters., 421 B.R. at 643*. The existence of several badges constitutes "clear and convincing evidence of actual intent." *Id. at 644* (quoting *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005))*. In addition to the circumstantial evidence of fraudulent intent discussed above, at least badges (1), (2), and (8) are present here. With respect to the first badge, and as discussed more fully in Section III, the Trustee has successfully pled that the Transfers lacked "reasonably equivalent value" and "fair consideration." In connection with the second badge, the Moving Defendants had a close association with Madoff and BLMIS through Stanley Chais. Last, with regard to the eighth badge, every transfer was unusual and secretive in that the Transfers [*29] were made in the context of a Ponzi scheme. It appears, however, that the badges of fraud are designed to

Case 10-04256    Doc 13    Filed 05/13/11    Entered 05/13/11 14:31:50    Desc Main
Document        Page 20 of 35

Page 8

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

establish the fraudulent intent of a transferor, ra-
ther than a transferee, and thus are not necessarily
applicable. In any event, the Trustee has ade-
quately pled that the Family Defendants (1) had
motive and incentive to commit fraud and (2)
displayed conscious misbehavior or recklessness,
and thus the Court need not make a finding with
respect to these badges.

## ii. THE TRUSTEE HAS SUFFICIENTLY PLED FRAUDU-LENT INTENT UNDER THE NYDCL ON THE PART OF THE ENTITY DEFENDANTS

The Trustee has sufficiently pled the fraudulent
intent of the Entity Defendants, which include cor-
porations, trusts, and partnerships.

The Trustee has sufficiently alleged an agency rela-
tionship between the Entity Defendants and Stanley
Chais, such that Stanley Chais's alleged bad faith know-
ledge can be imputed to the Entity Defendants. [16] Based on
principles of New York agency law, the fraudulent
knowledge of an officer or director can be imputed to the
corporate entity he controls. *See S.E.C. v. Manor Nursing
Ctrs., Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972)* (im-
puting individual's knowledge of securities law violations
[*30] to corporate entity); *Bondi v. Bank of America (In re
Parmalat), 383 F. Supp. 2d 587, 597 (S.D.N.Y. 2005)*
("The acts performed and knowledge acquired by a cor-
porate officer or agent are imputed to the corporation
where the officer or agent was acting within the scope of
his or her employment."). Similarly, a trust can be attri-
buted with the knowledge of the individual or entity by
which it is controlled or dominated. *S.E.C. v. Ballesteros
Franco, 253 F. Supp. 2d 720, 730 (S.D.N.Y. 2003)* ("The
Trust defendants stand in the same position as those
corporations that have been held liable for securities fraud
based on the knowledge attributed to them from those
who controlled them."). Likewise, the knowledge of a
general partner can be imputed to the limited partnership.
*See* N.Y. P'SHIP LAW § 23 (McKinney 2010) (titled
"Partnership Charged With Knowledge Of Or Notice To
Partner"); *Franco v. English, 210 A.D.2d 630, 635, 620
N.Y.S.2d 156 (N.Y. App. Div. 1994), rev'd on other
grounds, 210 A.D.2d 630, 620 N.Y.S.2d 156.* These prin-
ciples are "consistent with the self-evident proposition
that a corporation [or entity] can act only through the
actions . . . of its agents." *Ballesteros Franco, 253 F.
Supp. 2d at 729.*

16    The  [*31] Trustee has also adequately pled
that the Entity Defendants are plausibly the alter
egos of Stanley Chais, who "dominated" and used
them as a mere instrument to facilitate his personal
interests and those of his family members. Compl.
at ¶ 92. Accordingly, Stanley Chais and the Entity

Defendants may be treated as one unit for pur-
poses of determining the sufficiency of the Trus-
tee's allegations. *S. New England Tel. Co. v.
Global NAPs Inc., 624 F.3d 123, 147 (2d Cir.
2010).* ("[O]nce alter ego status is established, 'the
alter egos are treated as one entity' for purposes of
. . . liability.").

Here, the Entity Defendants can be charged with the
fraudulent knowledge of Stanley Chais. In addition to
properly alleging that Stanley Chais served as trustee,
officer, director, and/or general partner of the Entity De-
fendants, *see, e.g.,* Compl. at ¶¶ 33, 56, 58, 59, 100, the
Trustee also alleges that Stanley Chais personally estab-
lished the Entity Defendants for his benefit and the benefit
of his family members and functioned as "principal and/or
directed and controlled the [Entity Defendants]" with
"unlimited access to and control of the funds" in the Entity
Defendants' IA Accounts, Compl. at  [*32] ¶¶ 92, 100,
101; *see, e.g., Ballesteros Franco, 253 F. Supp. 2d at
729-30* (imputing defendant's knowledge of fraud to trust
defendants where defendant established trusts for the
benefit of his close relatives and exerted control over trust
defendants). In particular, Stanley Chais reviewed and
notated customer statements, directed the purchase and
sale of securities, transferred funds and directed payments
to and among various Entity Defendants, and communi-
cated with, and provided direction to, BLMIS. Compl. at ¶
101. In light of Stanley Chais' connection with the Entity
Defendants, it is plausible that an agency relationship
existed such that the Entity Defendants can be charged
with Stanley Chais's intimate knowledge of the Ponzi
scheme. *See In re S. African Apartheid Litig., 617 F.
Supp. 2d 228, 273 (S.D.N.Y. 2009)* ("[T]he question is not
whether [the trustee] ha[s] proved the existence of an
agency relationship, merely whether [he] should have the
chance to do so.") (quoting *In re Parmalat Sec. Litig., 375
F. Supp. 2d 278, 294 (S.D.N.Y. 2005)).* Accordingly,
discovery is warranted to further explore these relation-
ships. [17]

17    It is plausible that the Entity Defendants can
also be  [*33] charged with the fraudulent intent
of the Family Defendants, who, alongside Stanley
Chais, served as the Entity Defendants' trustees,
officers, directors, and/or general partners. *See*
Compl. at ¶ 100 ("The [Entity Defendants] are
entities controlled or managed by Stanley Chais
together with one or more [Family Defendants],"
who were "trustees, officers and/or directors of
[the Entity Defendants]."). As established above,
the Court finds that the Trustee sufficiently pled
fraudulent intent on the part of the Family De-
fendants. *See supra* Section I, B, i. Based on the
agency law principles set forth above, the Entity
Defendants can, in turn, be charged with the

Case 10-04256    Doc 13    Filed 05/13/11    Entered 05/13/11 14:31:50    Desc Main
Document    Page 21 of 35

Page 9

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

fraudulent knowledge held by the Family Defendants, yet another avenue ripe for exploration through discovery.

In light of the foregoing, assuming such is required by the NYDCL, the Trustee has sufficiently pled the fraudulent intent of the Entity Defendants under *Rule 9(b)*.

## II. THE TRUSTEE HAS SUFFICIENTLY PLED CONSTRUCTIVE FRAUD PURSUANT TO THE CODE AND THE NYDCL

The Trustee has sufficiently pled Count Four of the Complaint pursuant to *sections 548(a)(1)(B)*, *550* and *551* of the Code and Counts Six, Seven, and Eight pursuant to *sections 273-275*, [*34] *278*, and/or *279* of the NYDCL, in conjunction with *sections 544*, *550*, *551*, and *1107* of the Code, to avoid and recover transfers on the basis that they were constructively fraudulent.

### A. The Trustee's Constructive Fraud Claims Under the Code Are Adequately Pled

To prevail on a constructive fraud claim, the Trustee must show, *inter alia*, that the debtor, BLMIS, did not receive "reasonably equivalent value" for the transfer. *11 U.S.C. § 548(a)(1)(B)(i)*. The heightened federal pleading standard for allegations of fraud does not apply to a complaint to avoid transfers as constructively fraudulent. *See Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801-02 (Bankr. S.D.N.Y. 2005).

The Moving Defendants argue that the Trustee's constructive fraudulent transfer claims fail as a matter of law because BLMIS received reasonably equivalent value. They base their argument on caselaw standing for the proposition that each investor in a fraudulent investment scheme holds a claim for fraudulent inducement against the debtor, entitling the investor to restitution of its principal investment. These restitution claims constitute antecedent debts. Under the Code, satisfaction [*35] of an antecedent debt constitutes value. *11 U.S.C. § 548(d)(2)(A)* ("'[V]alue' means property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ."). Investors' redemptions up to the amount of their principal satisfy the debtor's restitution claim debts, and thus constitute value to the debtor. Here, the Moving Defendants posit that they "have a claim against BLMIS for restitution of the principal sums entrusted to the scheme," which constitutes value. Defs' Partial MTD at p. 21. In addition, they maintain that the Complaint contains "no allegations that any of the Defendants' accounts received distributions from BLMIS in excess of that principal sum." Defs' Partial MTD at p. 22. On these grounds, the Moving Defendants contend that the Trustee's con-

structive fraudulent transfer claims must fail as a matter of law.

First, the Moving Defendants are not entitled to restitution of their principal, as the Trustee has sufficiently alleged that they are not "innocent" investors. Only innocent investors who reasonably believed that they were investing in a legitimate enterprise are entitled to claims for restitution. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008) [*36] (concluding that "good faith" investors in a Ponzi scheme acquired a claim for restitution up to the amount invested); *Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.)*, 84 F.3d 1286, 1289-90 (10th Cir. 1996) (holding that an investor who was undisputedly "fraudulently induced" to participate in a Ponzi scheme had a restitution claim up to the amount invested); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 596 n.7 (9th Cir. 1991) ("If investments were made with culpable knowledge, all subsequent payments made to such investors within one year of the debtors' bankruptcy would be avoidable under *section 548(a)(2)*, regardless of the amount invested, because the debtors would not have exchanged a reasonably equivalent value for the payments."); *Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital, Inc.)*, 260 B.R. 343, 351 (Bankr. W.D.N.Y. 2001) (noting a "universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in good faith, you have given value and are entitled to a reasonable return"); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) ("[A]n [*37] investor having actual knowledge of the underlying fraud may not have a claim for restitution, and will not be deemed to have given reasonably equivalent value in exchange for payments from a Ponzi scheme."). Here, however, the Moving Defendants cannot benefit from the remedy of restitution because the Trustee has sufficiently pled that they were not "innocent" investors; rather, as discussed above, it is plausible that they knew or should have known of the Madoff fraud and helped to perpetuate it.

The Trustee's assertion that only "innocent" investors are entitled to restitution claims is also consistent with the equitable nature of the remedy of restitution. It is well settled that restitution is "a remedy traditionally viewed as 'equitable.'" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993). Thus, investors who have knowledge of, and help perpetuate, a fraud should not be permitted to benefit in the form of restitution. As the Supreme Court pointed out, "one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Gibbs & Sterrett Mfg. Co. v. Brucker*, 111 U.S. 597, 601, 4 S. Ct. 572, 28 L. Ed. 534 (1884). [*38] The *Independent*

Case 10-04256    Doc 13    Filed 05/13/11    Entered 05/13/11 14:31:50    Desc Main
Document    Page 22 of 35

Page 10

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

*Clearing House* case, relied upon by the Moving Defendants, reaches the same conclusion: "For a court to lend its aid to a wrongdo[er] . . . is to lend its sanction to the wrong." *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 858 (D. Utah 1987); *see also Cruse v. Callwood*, Nos. 2006-71, et al., 2010 U.S. Dist. LEXIS 121424, 2010 WL 438173, at *3 (D. Virgin Is. Feb. 3, 2010) ("[W]e therefore [] cannot support the trial court's equitable judgment of restitution where it found that Appellees [w]ere aware of the glaringly iniquitous mechanics of this transparent get-rich-quick scheme."). Accordingly, taking the facts alleged in the Complaint as true, the Moving Defendants are not entitled to restitution claims, and thus cannot be said to have given reasonably equivalent value in exchange for their receipt of the relevant Transfers.

Logic dictates the same outcome; if the consideration for a transfer is satisfaction of an antecedent debt, the debt must be legally enforceable. Since investors in a Ponzi scheme are entitled to only an equitable right of repayment, there can be no legally enforceable debt if the investors acted in bad faith. Therefore, while innocent investors are entitled [*39] to restitution claims up to the amount of their principal, such is not the case when investors, like the Moving Defendants, are alleged to have had knowledge of, and played a part in, furthering the fraud.

Second, in accordance with *Rule 8*, the Trustee has sufficiently pled that the Transfers consisted, at least in part, of fictitious profits and therefore lacked reasonably equivalent value. As courts have consistently held, and the Moving Defendants have conceded, when investors invest in a Ponzi scheme, any payments that exceed their principal investments are not made for reasonably equivalent value and can be recovered by the Trustee as fraudulent conveyances. *See, e.g., Donell*, 533 F.3d at 770 ("Where causes of action are brought . . . against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers . . . ."); *Hedged-Inv. Assocs., Inc.*, 84 F.3d at 1290; *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995); *United Energy Corp.*, 944 F.2d at 595 n.6 (9th Cir. 1991); *Terry v. June*, 432 F. Supp. 2d 635, 642-43; *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P.*, 362 B.R. 624, 636 (Bankr. S.D.N.Y. 2007) [*40] ("Plaintiffs are correct in asserting in their brief that virtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers.") (internal quotations omitted); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 643-46 (Bankr. S.D. Ohio 2006); *Soule v. Alliot (In re*

*Tiger Petroleum Co.)*, 319 B.R. 225, 239 (Bankr. N.D. Okla. 2004); *Lake States Commodities*, 253 B.R. at 871. [18] This is because transfers received in a Ponzi scheme in excess of an investor's investment are not transferred for reasonably equivalent value. *United Energy Corp.*, 944 F.2d at 595, n.6 ("Such excess amounts would be avoidable because the debtor would not have received reasonably equivalent value."); *Lake States Commodities*, 253 B.R. at 872 (" '[F]alse profits' are not paid in exchange for reasonably equivalent value.").

> 18   In fact, this Court recently stated in dicta that transfers of fictitious profits are voidable. *SIPC v. BLMIS (In re BLMIS)*, 424 B.R. 122, 136 (Bankr. S.D.N.Y. 2010).

Here, the Trustee has alleged in the Complaint that the Moving Defendants [*41] collectively withdrew more than $1 billion from BLMIS since December 1995, which consisted, in part, of fictitious profits generated by a Ponzi scheme. Compl. at ¶ 102 ("The source of funds in many of the [Entity Defendants' IA Accounts] was fictitious profits received by Chais for his participation in the Ponzi scheme."); *see also* Compl. at ¶¶ 25, 27, 106. Moreover, Exhibit B specifically identifies in detail the Transfers to the Moving Defendants, including the date, transferor, transferee and amount transferred. With respect to transfers of fictitious profits, these allegations undeniably render the constructive fraud claims plausible, and provide the Moving Defendants with fair notice of the claims asserted against them. *Twombly*, 550 U.S. at 555-56; *see also Rule 8(a)*.

In any event, the Court need not make a finding as to the merits of these issues, as they are inappropriate for a motion to dismiss. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005). ("[T]he question of 'reasonably equivalent value' . . . is fact intensive, and usually cannot be determined on the pleadings."). At this early stage, the Trustee has adequately [*42] pled a lack of reasonably equivalent value with regard to both principal and fictitious profits for purposes of *section 548(a)(1)(B)* of the Code.

Accordingly, the Trustee has adequately stated a claim for constructive fraudulent transfers under the Code, and the Motion to Dismiss Count Four of the Complaint is denied.

## B. The Trustee's Constructive Fraud Claims Under the NYDCL Are Adequately Pled

Under the NYDCL provisions governing constructively fraudulent transfers, the Trustee may avoid those transfers for which BLMIS did not receive "fair consideration." *NYDCL §§ 273-275*. "Fair consideration" re-

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

quires not only "fair equivalent" property, but also that the transferee receive the transfer in good faith. *NYDCL § 272*; *HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1058-59 (2d Cir. 1995)* (holding that "fair consideration" requires not only that the exchange be for equivalent value, but also that the conveyance be made in good faith); *Actrade Fin. Techs. Ltd., 337 B.R. at 802* ("Under New York law, the party seeking to have the transfer set aside has the burden of proof on the element of fair consideration and, since it is essential to a finding of fair consideration, good faith.") (citing *United States v. McCombs, 30 F.3d 310, 326 (2d Cir. 1994)*);   [*43] *Mendelsohn v. Jacobowitz (In re Jacobs), 394 B.R. 646, 662 (Bankr. E.D.N.Y. 2008)* (holding that "fair consideration" has a good faith component). Under the NYDCL, as under the Code, the heightened requirements of *Rule 9(b)* do not apply to the Trustee's constructive fraud claims. *See Actrade Fin. Techs. Ltd., 337 B.R. at 801-02*. Rather, "the sole consideration should be whether, consistent with the requirements of *Rule 8(a)*, the complaint gives the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges." *Nisselson v. Drew Indus., Inc., (In re White Metal Rolling & Stamping Corp.), 222 B.R. 417, 429 (Bankr. S.D.N.Y. 1998)*.

As discussed in depth in Section I, B, the Trustee has enumerated multiple instances of bad faith, thereby adequately pleading a lack of fair consideration for the Transfers. The Trustee has pointed to numerous facts demonstrating that the Moving Defendants continued to invest and profit while, among other things, receiving astronomical and unrealistic returns and receiving statements with backdated transaction histories, with actual or constructive knowledge that they were participating in and perpetuating a fraud. [19] Accordingly,   [*44] at this stage, taking the Trustee's allegations as true, this Court finds that the Trustee has adequately stated a claim for constructive fraudulent conveyance under the NYDCL. As such, the Motion to Dismiss Counts Six through Eight of the Complaint is denied.

19   While the Moving Defendants argue that reasonably equivalent value under the Code and fair consideration under the NYDCL "have substantially the same meaning," they do, however, concede in a footnote that the NYDCL defines fair consideration to include a good faith component. *See* Defs' Partial MTD at p. 21 n.3

## C. The Principal Sum Does Not Include "Expected Returns"

In addition to arguing that they are entitled to restitution of the principal amounts entrusted to BLMIS, the Moving Defendants also contend that they are entitled to retain an unspecified amount of "expected returns." They assert that when a Ponzi scheme operator is a broker-dealer, investors' restitution claims are not limited to the amounts principally invested, but rather, the amounts they expected to earn on those investments. In the context of this Ponzi scheme, the Moving Defendants argue that their expectations were reflected on their fictitious November 30,   [*45] 2008 BLMIS account statements, which, as a result, requires the Trustee to plead that the Transfers exceeded the phantom account balances provided therein. Although this argument is rendered moot by the Court's finding in Section I, B that the Trustee has adequately pled that the Moving Defendants acted in bad faith and are therefore not entitled to restitution claims in the amount of even their principal investments, the Court will nonetheless address the merits of the argument in the interest of completeness.

To support their position, the Moving Defendants cite to a Sixth Circuit unpublished decision, *Visconsi v. Lehman Bros. Inc., 244 Fed. Appx. 708 (6th Cir. 2007)*. There, the Circuit affirmed the enforcement of an arbitration award against Lehman Brothers. The arbitration award arose in connection with a fraudulent investment scheme orchestrated by a stockbroker employed by Lehman Brothers and awarded the plaintiffs expectation damages in excess of their initial investment. Lehman Brothers sought to vacate the award because the plaintiff actually gained more than $5.2 million in excess of their initial investment. The Circuit disagreed and affirmed the arbitrator's award. The Moving   [*46] Defendants assert that this Court should likewise recognize that defrauded investors are entitled to expectation damages above their initial investment--namely, the fictitious amounts reflected on their last BLMIS account statements.

The *Visconsi* case is not controlling here. First, in upholding the arbitrator's award, the Circuit emphasized that an arbitrator's ruling will only be vacated if it "manifestly disregarded the law," *Visconsi, 244 Fed. Appx. at 711*, and further stated that "Lehman faces a nearly impossible burden" because the arbitrators issued the award without a written opinion. *Id. at 712*. Thus, the Circuit did not affirmatively endorse the granting of expectation damages, but instead merely reinforced the difficulty associated with vacating an arbitrator's award, particularly when a written opinion is not present. Second, unlike the case at hand, the issue of expectation damages was not decided in connection with a fraudulent transfer claim where reasonably equivalent value was at issue. Last, and most importantly, the *Visconsi* case was not decided in the context of a liquidation proceeding. Given that Lehman Brothers was solvent and had assets of its own to satisfy the arbitration   [*47] award, enforcing the award against Lehman Brothers would not, unlike here, be to the detriment of other investors. Accordingly, because the facts in *Visconsi* are entirely different from those before the

Case 10-04256    Doc 13    Filed 05/13/11    Entered 05/13/11 14:31:50    Desc Main
Document    Page 24 of 35

Page 12

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

Court, its holding does not support the Moving Defendants' position. [20]

20    On March 1, 2010, the Court rendered its Net Equity Decision, holding that the value of a customer's claim in the SIPA liquidation is the amount he deposited in his BLMIS account, less any amounts withdrawn. *See generally SIPC v. BLMIS (In re BLMIS), 424 B.R. 122 (Bankr. S.D.N.Y. 2010).* While the Court did not decide the value of a hypothetical restitution claim, the Court affirmatively ruled that the net amount invested, and not the amount reflected on a BLMIS account statement, dictates the value of a customer's claim.

### III. THE TRUSTEE HAS PROPERLY ALLEGED THAT THE RELEVANT DATE FOR SIX YEAR FRAUDULENT CONVEYANCES UNDER THE NYDCL IS THE FILING DATE OF THE SIPA PROCEEDING

With respect to the Trustee's fraudulent conveyance actions under the NYDCL, the Court finds that the relevant look-back period extends to those Transfers made as early as December 11, 2002, six years before the December 11, 2008 Filing Date of [*48] the SIPA liquidation proceeding. *See* Compl. at ¶ 108.

The Moving Defendants argue that the statute of limitations for fraudulent conveyance actions under *section 213* of the New York Civil Procedure Law and Rules (the "NYCPLR"), [21] incorporated by reference in *section 544(b)* of the Code, looks back six years from the filing of the *Complaint*, filed on May 1, 2009, rather than from the *Filing Date*, December 11, 2008. In effect, the Moving Defendants challenge the Trustee's attempts to recover those Transfers made in the period between December 11, 2002 and May 1, 2003.

21    *Section 213(8) of the NYCPLR* states, in relevant part, that the statute of limitation for bringing causes of action sounding in fraud is six years.

The issue raised by the Moving Defendants centers on the interplay between the applicable state statute of limitation period incorporated by *section 544(b)* and *section 546(a)* of the Code. Pursuant to *section 544(b)* of the Code, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable *under applicable law* by a creditor holding an unsecured claim . . . ." *11 U.S.C. § 544(b)* (emphasis added). Under this [*49] section, a trustee is permitted to step into the shoes of an unsecured creditor and utilize applicable state law avoidance statutes to recover fraudulently transferred property. *Universal Church v. Geltzer, 463 F.3d 218, 222 n.1 (2d Cir. 2006)* ("[T]he Bankruptcy Code allows the trustee to step into the shoes

of a creditor under state law and avoid any transfers such a creditor could have avoided."). *Section 546(a)* of the Code, in relevant part, states that an action or proceeding under *section 544* to avoid a transfer must be commenced within "2 years after the entry of the order for relief." *11 U.S.C. § 546(a).* The combination of these statutes raises the question, as one court has framed it, "[i]f the applicable non-bankruptcy law extinguishes a cause of action after the bankruptcy is commenced, but before the limitation period in *§ 546(a)(1)(A)*, which statute of limitation is applicable?" *Summitt Sec. Inc. v. Sandifur (In re Metro. Mortg. & Sec. Co., Inc.), 344 B.R. 138, 141 (Bankr. E.D. Wash. 2006).*

The Moving Defendants read these two Code provisions together to suggest that "the Trustee must bring any claim under *§ 544(b)* within *the shorter of* i) the limitations period provided [*50] by *[NY]CPLR 213* and ii) the two year post-commencement limitation period imposed by Code *§ 546(a)(1)(A).*" Defs' Partial MTD at p. 24. They argue that "[b]ecause the Trustee has no greater rights under *§ 544(b)* than an actual creditor would have under the NYDCL, he cannot recover transfers made prior to May 1, 2003 unless New York law tolls the statute of limitations" at the Filing Date, which it does not. *Id.* While the Moving Defendants endeavor to support this position, even they "recognize that a number of district and bankruptcy courts have [found that the six-year period runs from the Filing Date], including this court, and that the *Collier* treatise so states." *Id.* at p. 25 (citing 6 COLLIER ON BANKRUPTCY ¶ 546.02[1][b] (15th ed. rev. 2007) ("If the state law limitations period governing a fraudulent transfer action has not expired at the commencement of a bankruptcy case, the trustee may bring the action pursuant to *Section 544(b)*, provided that it is commenced within the *Section 546(a)* limitations period."). [22] The Court is likewise aware of the abundance of case law in support of the Trustee's position, as well as the strong policy goals involved, and is thus not prepared to [*51] adopt the Moving Defendants' construction of the law.

22    The Moving Defendants declare that these cases "are not well-reasoned." Defs' Partial MTD at p. 25.

Courts have consistently held that upon the filing of a bankruptcy case, state law statutes of limitation cease to have any continued effect, and, instead, the provisions of *section 546(a)* of the Code govern. Although the New York statute of limitations for fraudulent conveyance actions allows a creditor to recover transfers made six years before the filing of the *complaint*, it is well established that once a bankruptcy petition is filed, *section 546(a)* of the Code is triggered, allowing a trustee to recover transfers made six years before the *petition date.*

*See, e.g., O'Connel v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 107 (Bankr. S.D.N.Y. 2005) ("This would permit the Trustee to reach back to October 3, 1995, *six years before the Debtor's bankruptcy petition was filed*.") (emphasis added); *Eisenberg v. Feiner (In re Ahead By A Length, Inc.)*, 100 B.R. 157, 164 (Bankr. S.D.N.Y. 1989) (declining to dismiss complaint as untimely where "fraudulent scheme began fewer than *six years before the bankruptcy petition was filed*") [*52] (emphasis added); *Barnard v. Joffe (In re Inflight Newspapers, Inc.)*, 423 B.R. 6, 20 (Bankr. E.D.N.Y. 2010) ("[T]he operative date for determining the look-back period for recovering a transfer is the *petition date* . . . .") (emphasis added). In addition, *section 546(a)* of the Code separately provides that the trustee must commence such claims under *section 544(b)* within two years from "the entry of the order for relief." *11 U.S.C. § 546(a)*; *see also Randall's Island Family Ctrs. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs.)*, No. 02-2278, 2002 Bankr. LEXIS 1247, 2002 WL 31496229, at *1 (Bankr. S.D.N.Y. Nov. 8, 2002). Accordingly, as long as the six-year statute of limitations has not expired as of the petition date, a trustee is permitted to bring New York fraudulent conveyance actions in accordance with *section 544(b)* at *any* point during the two-year period set out in *section 546(a)*. *See, e.g., Finkel v. Polichuk (In re Polichuk)*, Adv. Proc. No. 10-0031 (ELF), 2010 Bankr. LEXIS 4345, 2010 WL 4878789, at *3 (Bankr. E.D. Pa. Nov. 23, 2010) ("Even though the state law cause of action may expire after the filing of the petition, but before the two-year limitation in *546(a)*, the two-year limit in § *546(a)* is applicable.") [*53] (internal citations omitted); *Sears Petroleum & Trans. Co. v. Burgess Constr. Servs., Inc.*, 417 F. Supp. 2d 212, 225 (D. Mass. 2006) ("Once the bankruptcy petition is filed, *11 U.S.C. § 546* governs the time for bringing the action, and . . . it is immaterial if the state limitations period accrues during the pendency of the bankruptcy case.").

Construing *section 546(a)* of the Code and the applicable state statute of limitation period in this manner fosters a trustee's ability to recover property for the benefit of the estate--a congressional goal intended to be achieved by the Code. *Summitt Sec. Inc. v. Sandifur (In re Metro. Mortg. & Sec. Co., Inc.)*, 344 B.R. 138, 141 (Bankr. E.D. Wash. 2006); *Princeton -- New York Inv., Inc.*, 219 B.R. at 65. Section 546(a) advances this goal by providing the trustee with some "breathing room to determine what claims to assert under § 544." *Gibbons v. First Fidelity Bank, N.A (In re Princeton-New York Inv., Inc.)*, 219 B.R. 55, 65 (D.N.J. 1998); *see also Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 677 (Bankr. S.D. Tex. 2007); *Bay State Milling Co. v. Martin (In re Martin)*, 142 B.R. 260, 266 (Bankr. N.D. Ill. 1992). Absent the additional two-year [*54] period under *section 546(a)*, a trustee could be forever barred from seeking fraudulently trans-

ferred property merely because actions were not commenced immediately upon the filing of the petition. It simply cannot be expected that a newly appointed trustee, with no prior knowledge of the debtor, could assert causes of action within applicable state statute of limitation periods that accrue in the very early stages of a case. *See Metro. Mortg., 344 B.R. at 141* (holding that requiring trustee to comply with state statute of limitation periods "would contravene the broad powers Congress has granted to the trustee under *§ 544*"); *Mancuso v. Cont'l Bank Nat'l Assoc. Chicago (In re Topcor, Inc.)*, 132 B.R. 119, 124-25 (Bankr. N.D. Tex. 1991) ("The most evident reason for providing trustees two years to bring avoidance actions is to ensure that the trustee has ample time to investigate any potential claims . . . ."). As such, courts have consistently held that that the applicable state's statute of limitation period is relevant only to determine whether the claim would have been timely as of the *petition date*.

Here, the Trustee may avoid those Transfers made as early as December 11, 2002, six [*55] years before the December 11, 2008 Filing Date in accordance with relevant law. First, the claims in Counts Five through Eight asserted under the NYDCL would have been timely because they seek to avoid only those Transfers that occurred within six years of the petition date, which in this case is the Filing Date. Second, the Complaint was timely filed under *section 546(a)* of the Code, as it was commenced within two years of the "order for relief," which in this case is also the Filing Date. Accordingly, contrary to the Moving Defendants' assertions, Counts Five through Eight of the Complaint seeking Transfers going back six years from the Filing Date are timely and have been properly pled. [23]

> 23   In addition, even if the Moving Defendants' position were correct, the Trustee may nonetheless avoid the Transfers that occurred in the disputed period between December 11, 2002 and May 1, 2003 due to New York's "discovery rule," which is discussed in detail in Section IV.

## IV. THE TRUSTEE HAS SUFFICIENTLY PLED CLAIMS FOR TRANSFERS PRIOR TO SIX YEARS BEFORE THE FILING DATE BASED ON THE DISCOVERY RULE

The Trustee has sufficiently pled Count Nine of the Complaint under *sections 276, 276-a, 278* and/or [*56] *279* of the NYDCL, and pursuant to *sections 544, 550(a)* and *551* of the Code, to recover actual fraudulent transfers from the Moving Defendants made more than six years before the Filing Date.

Under New York's "discovery rule," causes of action predicated on fraud "must be commenced within six years after the commission of the fraud or within two years of

Case 10-04256   Doc 13   Filed 05/13/11   Entered 05/13/11 14:31:50   Desc Main
Document   Page 26 of 35

Page 14

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

the date the fraud was or should have been discovered [with reasonable diligence], [w]hichever is longer." *Phillips v. Levie*, 593 F.2d 459, 462 n.12 (2d Cir. 1979); *see also Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387, 401 n.12 (2d Cir. 2001) ("New York's six year statute of limitations for fraud claims is a 'discovery rule.' "); *N.Y. C.P.L.R. §§ 213(8), 203(g)*. The Trustee seeks to utilize New York's discovery rule, in conjunction with his strong arm power under *section 544* and applicable sections of the NYDCL, to avoid "undiscovered transfers" that occurred more than six years before the Filing Date. To do this, the Trustee must show that during the period various Transfers were made, Madoff's fraud was either: (1) not discovered, and could not have been discovered with reasonable diligence, by at least one unsecured creditor; [*57] or (2) was only discovered, and could have only been discovered with reasonable diligence, by at least one unsecured creditor within two years of the Filing Date. *See 11 U.S.C. § 544(b)*.

The Moving Defendants argue that the "red flags," [24] which purportedly placed the Moving Defendants on notice of Madoff's fraud, preclude any inference that an investor exists who could invoke the discovery rule. Defs' Partial MTD at p. 34 ("[I]f it was reasonable for the [Moving Defendants] to have known that they were receiving distributions from a Ponzi scheme based on [] publicly known facts, it was equally reasonable for any other non-professional investor to have known the same thing."). In addition, they contend that the Trustee lacks standing because he has failed to identify a specific unsecured creditor who could invoke the discovery rule. For the reasons set forth below, the Court disagrees and finds that since the Trustee filed the Complaint within two years of the announcement of the BLMIS Ponzi scheme, he is entitled to seek recovery for all of the Transfers over the life of the Moving Defendants' accounts. [25]

> [24]  These red flags are discussed in Section I, B in connection with the Trustee's [*58] fraudulent transfer claims under the NYDCL. *See* Defs' Partial MTD at pp. 15-16, 33-34; Compl. at ¶ 104.
> [25]  The Moving Defendants also assert that the tolling provisions of *sections 213(8)* and *203(g)* of the NYCPLR do not apply to constructive fraud claims. Count Nine of the Complaint seeks to avoid only those Transfers predicated on actual fraud. Accordingly, the Court need not address this argument.

With regard to the Moving Defendants' first argument, it does not follow that because the indicia of fraud put the Moving Defendants on notice of the fraud, they were sufficient to put *all* investors on notice, as the Moving Defendants and other BLMIS investors are not similarly situated. First, the Trustee has adequately al-

leged indicia of fraud that pertain solely to the Moving Defendants and not generally to all Madoff victims, who could not have discovered the fraud with reasonable diligence. For example, the Trustee asserts that the Moving Defendants' IA Accounts reflected abnormally high annual returns, Compl. at ¶ 103(b), anomalous "losses" allegedly manufactured for tax purposes, *id*. at ¶ 103(d), and backdated trades "with monumental and patently incredible rates of return that far [*59] outpaced the market," *id*. at ¶ 103(e). These are only some of the numerous indicia of fraud setting the Moving Defendants apart from other BLMIS investors.

Second, in addition to the indicia of fraud particular to them, the Moving Defendants had means generally unavailable to all Madoff victims to discover the fraud. Unlike many BLMIS investors, the Moving Defendants had the benefit of the management of their accounts by Stanley Chais, a highly sophisticated and experienced investor who invested in BLMIS over many decades through more than 60 entity and/or personal accounts. Compl. at ¶ 33; *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006) ("The law is indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required."); *Tab P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807, 811 n.3 (S.D.N.Y. 1994) ("It is well settled that a court may consider the sophistication of a plaintiff investor in evaluating issues of inquiry notice . . . ."). Additionally, in light of Stanley Chais's unusually close relationship with Madoff on both a business and social level that spanned over thirty years, the Moving Defendants, whose accounts [*60] were controlled by Stanley Chais, were privy to information and dealings of BLMIS not known to other BLMIS investors. *See* Compl. at ¶¶ 92, 99, 100. Therefore, the sophistication, experience and totality of information available to the Moving Defendants by way of Stanley Chais should have put them on notice that they were benefiting from the fraud, differentiating them from other BLMIS investors.

With regard to the Moving Defendants' second argument, a trustee is not required to specifically identify a qualifying unsecured creditor in its complaint to assert standing under *section 544* of the Code in accordance with the pleading requirements of Rule 8. *See Musicland Holding Corp. v. Best Buy Co., (In re Musicland Holding Corp.), 398 B.R. 761, 780 (Bankr. S.D.N.Y. 2008)*. At most, a trustee need only identify a category of unsecured creditors in whose shoes standing is being asserted. *Global Crossing Estate Rep. v. Winnick, No. 04-CIV-2558 (GEL), 2006 U.S. Dist. LEXIS 53785, 2006 WL 2212776, at *11 (S.D.N.Y. Aug. 3, 2006)* ("[T]here is no authority for the proposition that the Estate Representative must be more specific than to identify the category of creditors with potentially viable claims."). However, even such

Case 10-04256    Doc 13    Filed 05/13/11    Entered 05/13/11 14:31:50    Desc Main
Document    Page 27 of 35

Page 15

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

[*61] is not required; instead, simply pleading the existence of an unsecured creditor generally will suffice to satisfy *Rule 8(a)(2)*. *In re RCM Global Long Term Cap. Apprec. Fund, Ltd., 200 B.R. 514, 523-24 (Bankr. S.D.N.Y. 1996)* (holding that pleading the existence of an unsecured creditor with an allowable claim is sufficient); *see also In re Musicland, 398 B.R. at 780* ("Thus, *RCM* supports the proposition that the plaintiff may plead the existence of the qualifying creditor generally, and prove the existence of an actual, qualifying creditor at trial.").

Here, the Trustee has not only adequately pled generally the existence of a qualified unsecured creditor, but has also satisfied the more stringent standard of pleading the existence of a category of creditors who could invoke the discovery rule. The Trustee asserts that "[a]t all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS," Compl. at ¶ 160, and that "[a]t all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable [*62] . . . ." *Id.* at ¶ 161. Such is more than sufficient to satisfy the standard set out by the *RCM* court, which requires that the Trustee plead only the existence of a qualifying unsecured creditor generally. *RCM, 200 B.R. at 524*. In fact, in *Musicland*, the court observed that it had "not been able to locate a case in this district supporting the proposition that the plaintiff must name the qualifying creditor in the complaint, or suffer dismissal." *In re Musicland, 398 B.R. at 780*. Moreover, the Complaint additionally satisfies the stricter standard set out in *Global Crossing*. [26] The Complaint provides sufficient notice to the Moving Defendants of at least one category of creditors on whose claims the Trustee bases his standing: the clearly defrauded BLMIS customers. *See* Compl. at ¶ 4 ("The Trustee seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers."); *id.* at ¶¶ 14, 17c. Accordingly, based on these allegations, the Complaint more than satisfies the pleading standard under *Rule 8*.

> 26    It is worth mentioning that the *Global Crossing* court did not hold that a category of qualifying unsecured creditors must be pled. Instead, the plaintiff [*63] in *Global Crossing* pled a category of unsecured creditors and the court held that such was more than sufficient to satisfy *Rule 8*. Thus, the holding in *Global Crossing* does not overturn the more liberal standard set out in *RCM*.

In any event, while the Trustee has sufficiently alleged the existence of creditors who could not reasonably have discovered the fraud, adjudication of this issue is premature at the motion to dismiss stage. *Schmidt v.*

*McKay, 555 F.2d 30, 37 (2d Cir. 1977)* (holding that whether a plaintiff knew or could have known with reasonable diligence of fraud is a mixed question of law and fact that "ordinarily should not be disposed of by summary disposition"); *Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 673 (D.R.I. 1998)* ("A probing inquiry into who the creditors are, and what claims they hold, is inappropriate [on a motion to dismiss]."); *Trepuk v. Frank, 44 N.Y.2d 723, 725, 376 N.E.2d 419, 405 N.Y.S.2d 452 (N.Y. 1978)* ("Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts.").

Accordingly, for [*64] the reasons discussed above, the Motion to Dismiss with respect to Count Nine of the Complaint is denied.

## V. THE TRUSTEE HAS ADEQUATELY PLED CLAIMS TO RECOVER SUBSEQUENT TRANSFERS FROM THE MOVING DEFENDANTS

The Trustee has sufficiently pled Count Ten of the Complaint to recover funds subsequently transferred to the Moving Defendants under *section 550(a)(2)* of the Code and *section 278 of the NYDCL. See 11 U.S.C. § 550(a)(2)* (allowing recovery from "any immediate or mediate transferee of such initial transferee"); *NYDCL § 278* (allowing recovery from "any person"); *Farm Stores, Inc. v. Sch. Feeding Corp., 102 A.D.2d 249, 255, 477 N.Y.S.2d 374 (App. Div. 2d Dep't 1984)* ("[E]ach transferee . . . is liable to the creditor to the extent of the value of the money or property he or she wrongfully received.") (emphasis added).

In determining whether a claim to recover fraudulent transfers from a subsequent transferee is adequately pled, the Court need only apply a *Rule 8* analysis. *SIPC v. Stratton Oakmont, Inc., 234 B.R. 293, 317-18 (Bankr. S.D.N.Y. 1999)* ("[R]ecovery under § 550(a) is not subject to a particularized pleading standard . . . ."). As such, the Trustee must provide only a "short and [*65] plain statement of the claim showing that [he] is entitled to relief." *FED. R. CIV. P. 8(a)(2)*. The purpose of this pleading requirement is to ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Scheidelman v. Henderson (In re Henderson), 423 B.R. 598, 612 (Bankr. N.D.N.Y. 2010)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*) (internal quotations omitted). Consistent with precedent in this Circuit, a trustee need only demonstrate "sufficient facts to show, if proved, that the funds at issue originated with the debtor." *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.), 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007)*. However, a "dollar-for-dollar accounting is not

Case 10-04256   Doc 13   Filed 05/13/11   Entered 05/13/11 14:31:50   Desc Main
Document   Page 28 of 35

Page 16

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

required . . . at the pleading stage." *Id.* (finding subsequent transfer claim adequately pled where complaint stated, "at least tens of millions of dollars were fraudulently diverted from [debtor] to [initial transferees] . . . [and] a portion of these fraudulently diverted funds was transferred from the [initial transferees] to, or for the benefit of, the [subsequent transferees].").

Here, the Complaint satisfies [*66] *Rule 8* by providing "fair notice" to the Moving Defendants of the Subsequent Transfers sought to be recovered. As discussed previously, the Trustee has alleged initial Transfers totaling more than $1.1 billion, which are set forth with particularity in Exhibit B to the Complaint, specifying the dates upon which they took place, the method of transfer, the transferor, and the specific transferees. Compl. at Ex. B. The Complaint then provides that "some or all of the[se] Transfers were subsequently transferred . . . to Defendant Chais and/or other Defendants in the form of payment of commissions or fees, transfers from one account to another, or other means." [27] Compl. at ¶ 166. The Complaint thus "adequately apprises" the Moving Defendants of the Subsequent Transfers at issue. *Stratton Oakmont, Inc., 234 B.R. at 318.*

> 27   The Moving Defendants erroneously argue that "the Trustee is not permitted to rely upon information and belief pleading" because "he has account records related to the Defendants' BLMIS accounts." *See* Defs' Partial MTD at p. 36 n.15. This argument is incorrectly premised upon a general principal, subject to exception, that "*Rule 9(b)* pleadings [fraud or mistake] cannot [*67] be based upon information and belief." *DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)* (citing *Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972)).* As discussed above, the Trustee's subsequent transfer claims, which do not depend upon allegations of fraud or mistake, are subject only to a *Rule 8* pleading standard. In any event, the exception to the general principle would apply here, as "pleadings on information and belief are acceptable as to facts peculiarly within the opposing party's knowledge." *Breeden v. Bennett (In re Bennett Funding Group, Inc.), 367 B.R. 269, 298 (Bankr. N.D.N.Y. 2007)* (quoting *DiVittorio, 822 F.2d at 1247*) (internal quotations omitted). Here, the details of subsequent transactions by and between the Moving Defendants, if any, are uniquely in their possession, and should be made available to the Trustee through discovery. *See id.* ("[D]espite the Trustee's post hoc access to BFG's books and records, the byzantine nature and extensive duration of the alleged fraud necessarily resulted in

certain facts remaining peculiarly within Bennett's knowledge.").

Moreover, the Trustee "is an outsider to these transactions and will need [*68] discovery to identify the specific [Subsequent Transfers] . . . by date, amount and the manner in which they were effected." *See Jalbert v. Zurich Am. Ins. Co. (In re Payton Constr. Corp.), 399 B.R. 352, 365 (Bankr. D. Mass. 2009).* The Moving Defendants are a group of interrelated individuals and entities closely associated with defendant Stanley Chais, all of whom maintained BLMIS accounts and received direct Transfers. Whether they additionally received Subsequent Transfers of BLMIS funds from one another is a question to which they, and they alone, have the requisite information to respond. As such, the Trustee has adequately stated a claim for relief entitling him to discovery into his subsequent transfer claims.

Accordingly, the Motion to Dismiss with respect to Count Ten of the Complaint is denied.

## VI. THE TRUSTEE HAS NOT SUFFICIENTLY PLED TURNOVER AND ACCOUNTING PURSUANT TO *SECTION 542* OF THE CODE[28]

> 28   The issue of turnover was recently decided in this Court's decision, *Picard v. Merkin (In re BLMIS), 440 B.R. 243 (Bankr. S.D.N.Y. 2010).*

With respect to Count One of the Complaint, the Trustee has not adequately stated a claim for immediate turnover of transferred funds and accounting [*69] under *section 542* of the Code.

*Section 542* of the Code states, in relevant part, that "an entity . . . in possession, custody, or control, during the case, of [property of the estate] . . . shall deliver to the trustee, and account for, such property or the value of such property." *11 U.S.C. § 542(a).* The Defendants argue that the Trustee may not use *section 542* of the Code to recover prepetition transfers because they do not become "property of the estate" unless and until they are recovered through a successful avoidance action, which in essence requires a two-step process. *FDIC v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 131 (2d Cir. 1992); Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005)* ("[P]roperty that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered."). In contrast, the Trustee contends that in this hybrid proceeding under both SIPA and the Code, SIPA *section 78fff-2(c)(3)* alters the nature of *section 542* of the Code to permit a SIPA trustee to recover prepetition transfers in one step upon a *prima facie* showing that the transfer is "voidable or void," [*70] without the need for

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

an avoidance action and separate recovery under *section 550* of the Code. SIPA *§ 78fff-2(c)(3)*.

As evidenced by the divergent positions of the parties, the plain language of *SIPA section 78fff-2(c)(3)* is subject to differing interpretations, and there is a dearth of interpretative caselaw. In fact, this Court has located only nine cases addressing *SIPA section 78fff-2(c)(3)*, three of which merely cite the statute without analysis or discussion. [29] Yet, none of these cases addresses the instant question as to whether *SIPA section 78fff-2(c)(3)* makes property that was transferred prepetition to a third party "property of the debtor" for purposes of turnover under *section 542* of the Code. Thus, the Court requested and reviewed supplemental briefing from the parties to address this issue (the "Supplemental Briefing") (Dkt. Nos. 78-80).

[29]   Three of the nine cases merely cite to *SIPA section 78fff-2(c)(3)* without any analysis or discussion. *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.), 435 B.R. 866, 886 (Bankr. S.D.N.Y. 2010); Picard v. Fox, (In re BLMIS), 429 B.R. 423, 427 n.4 (Bankr. S.D.N.Y. 2010)* (Lifland, J.); *Sec. Investor Prot. Corp. v. BLMIS (In re BLMIS), 424 B.R. 122, 136 (Bankr. S.D.N.Y. 2010)* [*71] (Lifland, J.). The remaining six cases analyze SIPA *section 78fff-2(c)(3)* in conjunction with avoidance provisions of the Code, supporting the Moving Defendants' interpretation. *Picard v. Taylor (In re Park South Sec., LLC.), 326 B.R. 505, 512-13 (Bankr. S.D.N.Y. 2005); Trefny v. Bear Stearns Sec. Corp., 243 B.R. 300, 320-23 (S.D. Tex. 1999); Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.), Nos. 95-08203 (JLG), et al., 1998 Bankr. LEXIS 1076, 1998 WL 551972, at *17 (Bankr. S.D.N.Y. Aug. 24, 1998); Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 218 B.R. 689, 702 (Bankr. S.D.N.Y. 1998); Hill v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman, Inc.), 94 B.R. 817, 825-27 (D.N.J. 1989); Hill v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman, Inc.), 83 B.R. 880, 886-88 (D.N.J. 1988)* ("Bevill I").

Consistent with the Trustee's position and the bankruptcy court's expansive *in rem* jurisdiction, [30] the most efficient application of the hybrid SIPA and Code statutes is to bypass the two-step recovery process and allow the Trustee to expeditiously collect the funds using turnover under *section 542* of the Code. Unfortunately, however, there is nothing in the plain language of *SIPA section 78fff-2(c)(3)* [*72] or in the limited interpretive caselaw to give such an "*in rem* spin" to the Trustee's one-step turnover quest under *section 542* of the Code. [31]

[30]   *See Cent. Virginia Comm. Coll. v. Katz, 546 U.S. 356, 369, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006)* (supporting the bankruptcy court's expansive in rem jurisdiction by upholding a trustee's avoidance actions against a state agency); *State Comp. Ins. Fund v. Zamora (In re Silverman), 616 F.3d 1001, 1008 (9th Cir. 2010)* (holding that a chapter 11 trustee may avoid and recover criminal restitution payments under *section 547(b)* of the Code).

[31]   It is conceivable, however, for the Trustee to find support at law outside of turnover.

The plain language of *SIPA section 78fff-2(c)(3)* creates a fiction that grants the trustee standing to bring avoidance actions under the Code. The avoidance provisions of the Code allow a trustee to "avoid any transfer . . . of *an interest of the debtor in property*." *11 U.S.C. §§ 547, 548* (emphasis added). In a SIPA proceeding, however, property held by a broker-debtor for the account of a customer is not property of the broker-debtor. Thus, a SIPA trustee would lack standing to utilize these avoidance sections. *SIPA section 78fff-2(c)(3)* [*73] states, in relevant part,

> [T]he Trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. *For the purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor* and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

*SIPA § 78fff-2(c)(3)* (emphasis added). *SIPA section 78fff-2(c)(3)* rectifies this defect by creating a fiction that such property "*shall be deemed to have been the property of the debtor*" at the time of the transfer. [32] *SIPA § 78fff-2(c)(3)* (emphasis added).

[32]   Similarly, *SIPA section 78fff-2(c)(3)* provides that a customer in receipt of a preference "shall be deemed to have been a creditor" at the time of transfer in order to ensure that the SIPA trustee has standing under *section 547* of the Code. *See 11 U.S.C. § 547* ("[T]he trustee may avoid any transfer of an interest of the debtor in property [*74] - (1) to or for the benefit of a creditor . . . .").

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

Further, the few cases construing *SIPA section 78fff-2(c)(3)* find that its limited purpose is to create this legal fiction. *Bevill I, 83 B.R. at 894* ("This fiction allows the SIPA trustee to avoid . . . transfers in spite of the fact that a broker-dealer liquidation technically does not involve the debtor-creditor relationship . . . ."). Indeed, the six courts that have analyzed this provision have done so only in the context of avoidance actions, never in conjunction with *section 542* of the Code. *See Picard v. Taylor (In re Park South Sec., LLC.), 326 B.R. 505, 512-13 (Bankr. S.D.N.Y. 2005)* (reading *SIPA Section 78fff-2(c)(3)* together with *sections 544* and *548*); *Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.), Nos. 95-08203 (JLG), et al., 1998 Bankr. LEXIS 1076, 1998 WL 551972, at \*17 (Bankr. S.D.N.Y. Aug. 24, 1998)* (stating that courts have held that *SIPA section 78fff-2(c)(3)* authorizes a trustee *to avoid* a transfer of customer property); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 218 B.R. 689, 702 (Bankr. S.D.N.Y. 1998)* (finding that *SIPA section 78fff-2(c)(3)* does not limit a trustee's avoidance power under *section 544*); *Trefny v. Bear Stearns Sec. Corp., 243 B.R. 300, 320-23 (S.D. Tex. 1999)* (reading *SIPA Section 78fff-2(c)(3)* together with *section 548*); *Hill v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman, Inc.), 94 B.R. 817, 825-27 (D.N.J. 1989)* (reading *SIPA section 78fff-2(c)(3)* together with *section 549*); *Bevill I, 83 B.R. at 886-88* (same).

Thus, the Court is constrained to find that while the Trustee has stated *prima facie* claims for avoidance under the Code and the NYDCL, the current state of the law does not support the requested *expeditious* turnover of the funds under *section 542* of the Code. To hold otherwise would give the "deemed to have been property of the debtor" language a more expansive meaning, something that Congress did not address.

In light of the foregoing analysis, the Motions to Dismiss are hereby granted with respect to Count One of the Complaint.

## VII. THE TRUSTEE HAS SUFFICIENTLY PLED A BASIS FOR DISALLOWING THE MOVING DEFENDANTS' SIPA CLAIMS

The Trustee has sufficiently pled Count Eleven of the Complaint to disallow the Moving Defendants' SIPA claims. The Trustee alleges that the claims filed by the Moving Defendants are (1) not supported by the books and records of BLMIS, and (2) should be disallowed under *section 502(d)* of the Code because [*76] the Moving Defendants received voidable Transfers that have not been returned to the Trustee. In response, the Moving Defendants declare that the first allegation is not supported by factual detail and thus does not satisfy *Twombly* and *Iqbal*. With respect to the second allegation, the

Moving Defendants argue that *section 502(d)* of the Code does not apply to insurance claims that are paid by SIPC.

The Trustee has sufficiently pled that the Moving Defendants' SIPA claims are not supported by the books and records of BLMIS. Compl. at ¶ 172. The books and records indicate that the Transfers to the Moving Defendants, detailed in Exhibit B, "were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the Accounts." Compl. at ¶ 106. Thus, the Moving Defendants allegedly received distributions above the amount of their principal contribution, precluding them from receiving SIPC advances and distributions from the pool of assets collected by Trustee. *See SIPC v. BLMIS (In re BLMIS), 424 B.R. 122, 125 (Bankr. S.D.N.Y. 2010)* (defining net equity by reference to amounts invested and withdrawn).

In addition, the Trustee has adequately pled the disallowance of the Moving [*77] Defendants' SIPA claims under *section 502(d)* of the Code, which states that, "the court shall disallow any claim of any entity . . . that is a transferee of a [voidable] transfer." *11 U.S.C. § 502(d)*. The purpose of this section is to "preclude entities that have received voidable transfers from sharing in the distribution of assets unless and until the voidable transfer has been returned to the estate." *In re Mid Atlantic Fund, Inc., 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986)*. As discussed, the Trustee has sufficiently pled his avoidance claims against the Moving Defendants. Moreover, they have not returned to the Trustee the funds purportedly transferred. As a result, the Trustee's claim under *section 502(d)* of the Code is adequately pled.

The Moving Defendants argue unconvincingly that *section 502(d)* of the Code does not apply to disallow their claims because a SIPA claim is an "insurance claim" against SIPC, rather than a claim against the broker-debtor's estate. In the Net Equity Decision, this Court addressed similar arguments advanced by certain BLMIS customers. Those claimants argued that SIPC provides an *insurance* fund, separate and apart from the pool of customer property, against [*78] which claims can be filed. In response, the Court found that Madoff customers are not "statutorily entitled to an additional source of recovery in the form of SIPC *insurance*, separate and apart from customer property distributions," explaining that "[t]his argument finds no support in the text of the statute, which characterizes SIPC payments as *advances* inextricably tied to distributions of customer property." *In re BLMIS, 424 B.R. at 133-34*. Accordingly, a net equity claim is not a claim against SIPC, but rather a claim against the pool of customer property collected by the Trustee. As such, the Court finds no merit to the Moving Defendants' argument and finds that the Trustee's claim under *section 502(d)* of the Code is appropriate. Accordingly, the Motion to Dismiss Count Eleven of the Complaint is denied.

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

## CONCLUSION

Accepting as true the facts pled in the Complaint and drawing all inferences that may be warranted by such facts, the Trustee has pled valid *prima facie* claims against the Moving Defendants in Counts Three through Eleven of the Complaint for, *inter alia*, avoidance of the redemption payments in their entirety under *sections 548(a)(1)(A)* and *548(a)(1)(B)* of the Code and [*79] corresponding sections of the NYDCL. The Trustee may or may not prove the requisite facts to establish the elements of his claims after discovery and a trial on the merits. Nevertheless, the Trustee's claims have been adequately pled, and the Motion to Dismiss under *Rule 12(b)(6)* is therefore DENIED as to these counts. With respect to Count One of the Complaint, the Trustee has not adequately stated a claim for immediate turnover of transferred funds under *section 542* of the Code and *SIPA section 78fff-2(c)(3)*, and the Motion to Dismiss is therefore GRANTED in this limited respect.

**IT IS SO ORDERED**.

Dated: New York, New York

February 24, 2010

/s/ Burton R. Lifland

UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

In re: BERNARD L. MADOFF INVESTMENT SECURITIES LLC, Debtor.

IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, Plaintiff, v. ESTATE OF STANLEY CHAIS, individually and as General Partner of Defendants The Brighton Company, The Lambeth Company, and The Popham Company, and as trustee for The 1994 Trust for the Children of Stanley and Pamela Chais, the 1996 Trust for the Children of Pamela Chais and Stanley Chais, the 1999 Trust for the Children of Stanley [*80] and Pamela Chais, the 1999 Trust for the Grandchildren of Stanley and Pamela Chais, the Chais 1991 Family Trust, the Emily Chais 1983 Trust, the Emily Chais Trust, the Emily Chais Issue Trust, the Mark Hugh Chais Trust, the Mark Chais Issue Trust, the Mark Hugh Chais 1983 Trust, the William Frederick Chais Trust, the William F. Chais Issue Trust, the William Frederick Chais 1983 Trust, the Ari Chais 1999 Trust, the Ari Chais Transferee #1 Trust, the Benjamin Paul Chasalow 1999 Trust, the Benjamin Paul Chasalow Transferee #1 Trust, the Chloe Francis Chais 1994 Trust, the Chloe Francis Chais Transferee #1 Trust, the Jonathan Wolf Chais Trust, the Jonathan Chais Transferee #1 Trust, the Justin Robert Chasalow 1999 Trust, the Justin Robert

Chasalow Transferee #1 Trust, the Madeline Celia Chais 1992 Trust, the Madeline Chais Transferee #1 Trust, the Rachel Allison Chasalow 1999 Trust, the Rachel Allison Chasalow Transferee #1 Trust, the Tali Chais 1997 Trust, the Tali Chais Transferee #1 Trust, the Onondaga, Inc. Defined Benefit Plan, and the Unicycle Corporation Money Purchase Plan;

PAMELA CHAIS, individually, as Executor of the Estate of Stanley Chais, and as trustee for the Chais 1991 [*81] Family Trust, the Appleby Productions Ltd., Defined Contribution Plan, the Appleby Productions Ltd. Money Purchase Plan, and the Appleby Productions Ltd. Profit Sharing Plan;

EMILY CHASALOW, individually and as trustee for the 1994 Trust for the Children of Stanley and Pamela Chais, the 1996 Trust for the Children of Pamela Chais and Stanley Chais, the 1999 Trust for the Children of Stanley and Pamela Chais, the 1999 Trust for the Grandchildren of Stanley and Pamela Chais, the Chais 1991 Family Trust, the Emily Chais 1983 Trust, the Emily Chais Trust, the Emily Chais Issue Trust, the Mark Hugh Chais Trust, the Mark Chais Issue Trust, the Mark Hugh Chais 1983 Trust, the William Frederick Chais Trust, the William F. Chais Issue Trust, the William Frederick Chais 1983 Trust, the Ari Chais 1999 Trust, the Ari Chais Transferee #1 Trust, the Benjamin Paul Chasalow 1999 Trust, the Benjamin Paul Chasalow Transferee #1 Trust, the Chloe Francis Chais 1994 Trust, the Chloe Francis Chais Transferee #1 Trust, the Jonathan Wolf Chais Trust, the Jonathan Chais Transferee #1 Trust, the Justin Robert Chasalow 1999 Trust, the Justin Robert Chasalow Transferee #1 Trust, the Madeline Celia Chais 1992 Trust, [*82] the Madeline Chais Transferee #1 Trust, the Rachel Allison Chasalow 1999 Trust, the Rachel Allison Chasalow Transferee #1 Trust, the Tali Chais 1997 Trust, and the Tali Chais Transferee #1 Trust;

MARK CHAIS, individually and as trustee for the 1994 Trust for the Children of Stanley and Pamela Chais, the 1996 Trust for the Children of Pamela Chais and Stanley Chais, the 1999 Trust for the Children of Stanley and Pamela Chais, the 1999 Trust for the Grandchildren of Stanley and Pamela Chais, the Chais 1991 Family Trust, the Emily Chais 1983 Trust, the Emily Chais Trust, the Emily Chais Issue Trust, the Mark Hugh Chais Trust, the Mark Chais Issue Trust, the Mark Hugh Chais 1983 Trust, the William Frederick Chais Trust, the William F. Chais Issue Trust, the William Frederick Chais 1983 Trust, the Ari Chais 1999 Trust, the Ari Chais Transferee #1 Trust, the Benjamin Paul Chasalow 1999 Trust, the Benjamin Paul Chasalow Transferee #1 Trust, the Chloe Francis Chais 1994 Trust, the Chloe Francis Chais Transferee #1 Trust, the Jonathan Wolf Chais Trust, the Jonathan Chais Transferee #1 Trust, the Justin Robert Chasalow 1999 Trust, the Justin Robert Chasalow

Case 10-04256   Doc 13   Filed 05/13/11   Entered 05/13/11 14:31:50   Desc Main
Document   Page 32 of 35
Page 20

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

Transferee #1 Trust, the Madeline Celia [*83] Chais 1992 Trust, the Madeline Chais Transferee #1 Trust, the Rachel Allison Chasalow 1999 Trust, the Rachel Allison Chasalow Transferee #1 Trust, the Tali Chais 1997 Trust, and the Tali Chais Transferee #1 Trust;

WILLIAM CHAIS individually and as trustee for the William Chais and Wrenn Chais 1994 Family Trust Dated 4/25/95, the 1994 Trust for the Children of Stanley and Pamela Chais, the 1996 Trust for the Children of Pamela Chais and Stanley Chais, the 1999 Trust for the Children of Stanley and Pamela Chais, the 1999 Trust for the Grandchildren of Stanley and Pamela Chais, the Chais 1991 Family Trust, the Emily Chais 1983 Trust, the Emily Chais Trust, the Emily Chais Issue Trust, the Mark Hugh Chais Trust, the Mark Chais Issue Trust, the Mark Hugh Chais 1983 Trust, the William Frederick Chais Trust, the William F. Chais Issue Trust, the William Frederick Chais 1983 Trust, the Ari Chais 1999 Trust, the Ari Chais Transferee #1 Trust, the Benjamin Paul Chasalow 1999 Trust, the Benjamin Paul Chasalow Transferee #1 Trust, the Chloe Francis Chais 1994 Trust, the Chloe Francis Chais Transferee #1 Trust, the Jonathan Wolf Chais Trust, the Jonathan Chais Transferee #1 Trust, the Justin Robert [*84] Chasalow 1999 Trust, the Justin Robert Chasalow Transferee #1 Trust, the Madeline Celia Chais 1992 Trust, the Madeline Chais Transferee #1 Trust, the Rachel Allison Chasalow 1999 Trust, the Rachel Allison Chasalow Transferee #1 Trust, the Tali Chais 1997 Trust, the Tali Chais Transferee #1 Trust, and the Onondaga, Inc. Defined Benefit Plan;

MICHAEL CHASALOW;

MIRIE CHAIS;

WRENN CHAIS, individually and as trustee for the William and Wrenn Chais 1994 Family Trust Dated 4/25/95;

ALBERT ANGEL, as trustee for The 1994 Trust for the Children of Stanley and Pamela Chais, the 1996 Trust for the Children of Pamela Chais and Stanley Chais, the 1999 Trust for the Children of Stanley and Pamela Chais, the 1999 Trust for the Grandchildren of Stanley and Pamela Chais, the Chais 1991 Family Trust, the Emily Chais 1983 Trust, the Emily Chais Trust, the Emily Chais Issue Trust, the Mark Hugh Chais Trust, the Mark Chais Issue Trust, the Mark Hugh Chais 1983 Trust, the William Frederick Chais Trust, the William F. Chais Issue Trust, the William Frederick Chais 1983 Trust, the Ari Chais Transferee #1 Trust, the Benjamin Paul Chasalow Transferee #1 Trust, the Chloe Francis Chais Transferee #1 Trust, the Jonathan [*85] Chais Transferee #1 Trust, the Justin Robert Chasalow Transferee #1 Trust, the Madeline Chais Transferee #1 Trust, the Rachel Allison Chasalow Transferee #1 Trust, and the Tali Chais Transferee #1 Trust;

THE BRIGHTON COMPANY;

THE LAMBETH COMPANY;

THE POPHAM COMPANY;

APPLEBY PRODUCTIONS LTD.;

THE APPLEBY PRODUCTIONS LTD. DEFINED CONTRIBUTION PLAN;

THE APPLEBY PRODUCTIONS LTD. MONEY PURCHASE PLAN;

THE APPLEBY PRODUCTIONS LTD. PROFIT SHARING PLAN;

THE UNICYCLE TRADING COMPANY;

UNICYCLE CORP., individually and as the General Partner of The Unicycle Trading Company;

THE UNICYCLE CORPORATION MONEY PURCHASE PLAN;

ONONDAGA, INC., individually and as General Partner of Chais Investments Ltd., a Nevada Limited Partnership;

THE ONONDAGA, INC. MONEY PURCHASE PLAN;

THE ONONDAGA, INC. DEFINED BENEFIT PENSION PLAN;

CHAIS INVESTMENTS, LTD.;

CHAIS FAMILY FOUNDATION;

CHAIS MANAGEMENT, INC., individually and as General Partner of Chais Management Ltd.;

CHAIS MANAGEMENT, LTD.;

CHAIS VENTURE HOLDINGS;

THE 1994 TRUST FOR THE CHILDREN OF STANLEY AND PAMELA CHAIS;

THE 1996 TRUST FOR THE CHILDREN OF PAMELA CHAIS AND STANLEY CHAIS;

THE 1999 TRUST FOR THE CHILDREN OF STANLEY AND PAMELA CHAIS;

THE 1999 TRUST FOR THE GRANDCHILDREN [*86] OF STANLEY AND PAMELA CHAIS;

THE CHAIS 1991 FAMILY TRUST;

THE EMILY CHAIS 1983 TRUST;

THE EMILY CHAIS TRUST;

THE EMILY CHAIS ISSUE TRUST;

THE MARK HUGH CHAIS TRUST;

445 B.R. 206; 2011 Bankr. LEXIS 606, *;
54 Bankr. Ct. Dec. 103

THE MARK HUGH CHAIS ISSUE TRUST;

THE MARK HUGH CHAIS 1983 TRUST;

THE WILLIAM FREDERICK CHAIS TRUST;

THE WILLIAM F. CHAIS ISSUE TRUST;

THE WILLIAM FREDERICK CHAIS 1983 TRUST;

THE WILLIAM AND WRENN CHAIS 1994 FAMILY TRUST;

THE ARI CHAIS 1999 TRUST;

THE ARI CHAIS TRANSFEREE #1 TRUST;

THE BENJAMIN PAUL CHASALOW 1999 TRUST;

THE BENJAMIN PAUL CHASALOW TRANSFEREE #1 TRUST;

THE CHLOE FRANCIS CHAIS 1994 TRUST;

THE CHLOE FRANCIS CHAIS TRANSFEREE #1 TRUST;

THE JONATHAN WOLF CHAIS TRUST;

THE JONATHAN CHAIS TRANSFEREE #1 TRUST;

THE JUSTIN ROBERT CHASALOW 1999 TRUST;

THE JUSTIN ROBERT CHASALOW TRANSFEREE #1 TRUST;

THE MADELINE CELIA CHAIS 1992 TRUST;

THE MADELINE CHAIS TRANSFEREE #1 TRUST;

THE RACHEL ALLISON CHASALOW 1999 TRUST;

THE RACHEL ALLISON CHASALOW TRANSFEREE #1 TRUST;

THE TALI CHAIS 1997 TRUST;

THE TALI CHAIS TRANSFEREE #1 TRUST;

and DOES 1-25;

Defendants.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re: | **Jointly Administered under**
**Case No. 08-45257**

Petters Company, Inc., et al. | Court File No. 08-45257

Debtors. | Court Files Nos.:

(includes:
Petters Group Worldwide, LLC;           08-45258 (GFK)
PC Funding, LLC;                        08-45326 (GFK)
Thousand Lakes, LLC;                    08-45327 (GFK)
SPF Funding, LLC;                       08-45328 (GFK)
PL Ltd., Inc.;                          08-45329 (GFK)
Edge One LLC;                           08-45330 (GFK)
MGC Finance, Inc.;                      08-45331 (GFK)
PAC Funding, LLC;                       08-45371 (GFK)
Palm Beach Finance Holdings, Inc.),     08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

---

Douglas A. Kelley, in his capacity as the
court-appointed Chapter 11 Trustee of
Debtor Petters Company, Inc. and Debtor Petters Group
Worldwide LLC,

Plaintiffs,

vs.                                     Adv. No. 10-04256

Alan M. Miller and A.M. Aero, Inc.

Defendants.

---

## UNSWORN CERTIFICATE OF SERVICE

---

I, Jenneane Jansen, declare that on May 13, 2011, I electronically filed a Notice of

Appearance on behalf of Defendants Alan M. Miller's and A.M. Aero, Inc. through this court's

Electronic Cases Filing System ("ECF"), and that such filing constitutes service on all filing

users, which represents all persons who filed an appearance in this matter, and includes, but is

not limited to the following:

Darryl L. Uphoff
Michael Olafson
Adam C. Bollinger
Lindquist & Vennum, P.L.L.P.
4200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2274

Dated this 21st day of April, 2011.

JOSEPH S. FRIEDBERG, CHARTERED

/e/Joseph S. Friedberg
Joseph S. Friedberg #32086
701 Fourth Avenue South, Suite 300
Minneapolis, MN 55412
Ph:  612-235-4820
joefriedberg@hotmail.com

and

JANSEN & PALMER, LLC

/e/Jenneane L Jansen
Jenneane L. Jansen #236792
4746 Elliot Avenue South
Minneapolis, MN  55407
Ph:  612-823-9088
jenneane@jansenpalmer.com